
[No. C064875. Third Dist. Jan. 20, 2012.]

CENTER FOR SIERRA NEVADA CONSERVATION et al., Plaintiffs and Appellants, v.
COUNTY OF EL DORADO, Defendant and Respondent.

1158

**COUNSEL**

Michael W. Graf for Plaintiffs and Appellants.

Louis B. Green, County Counsel, Michael J. Ciccozzi and Paula F. Frantz, Deputy County Counsel, for Defendant and Respondent.

**OPINION**

**HOCH, J.**—This appeal arises from the County of El Dorado's (County) adoption of an oak woodland management plan and mitigation fee program without an environmental impact report (EIR). The County issued a negative declaration for the plan and fee program, thereby dispensing with the requirement of an EIR under the California Environmental Quality Act (Pub. Resources Code, §§ 21000 et seq., 21050; CEQA).[1] The negative declaration was premised on a program EIR that the County completed in 2004 at the same time as it formulated its general plan (2004 General Plan). The 2004 General Plan allowed developers of more than 10 acres to conserve oak woodlands onsite at a one-to-one ratio as option A (Option A). The 2004 General Plan and program EIR also anticipated the development of an option B (Option B), which would allow developers to pay a mitigation fee under an oak woodland management plan instead of engaging in mitigation on the development site itself. However, neither the general plan nor the program EIR specified the fee rate for Option B, or how the collected fees should be used to mitigate the impact on the County's oak woodlands.

The County's adoption of the oak woodland management plan on a negative declaration was challenged by the Center for Sierra Nevada Conservation, El Dorado County Taxpayers for Quality Growth, and California Oak Foundation (collectively, the Center). The trial court concluded that the County was not required to prepare an EIR prior to adoption of the oak woodland management plan.

On appeal, the Center contends (1) the County violated CEQA by failing to prepare an EIR before adopting the oak woodland management plan and the Option B fee program, (2) the County erred in issuing a negative declaration for the oak woodland management plan and Option B fee program, and (3) the oak woodland management plan and Option B fee program conflict with the 2004 General Plan. With respect to the first two contentions, the County responds that the oak woodland management plan and Option B are within the scope of the 2004 program EIR and the environmental impacts were already adequately addressed in the program EIR. As to the third contention, the County asserts the oak woodland management plan and Option B fee program are consistent with the 2004 General Plan.

---

[1] Undesignated statutory references are to the Public Resources Code.

References to guidelines are to those located in California Code of Regulations, title 14, section 15000 et seq. (Guidelines). The secretary of the California Resources Agency has authority to promulgate guidelines to implement CEQA requirements. (§ 21083, subd. (e); see *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 105, fn. 2 [126 Cal.Rptr.2d 441] (*Communities for a Better Environment*).)

█ We disagree with the trial court and hold that the County was required to prepare a tiered EIR before its adoption of the oak woodland management plan and implementation of an Option B mitigation fee. Although the 2004 program EIR did anticipate the development of an oak woodland management plan and fee program, it did not provide the County with guidance in making the discretionary choices that served as the basis for the plan or fee program. Specifically, the program EIR did not set the fee rate, how the acreage subject to the Option B fee rate should be measured, or how the offsite oak woodland losses would be mitigated by the fees. Thus, the County could not rely on the 2004 program EIR for its conclusion that the adoption of the oak woodland management plan and fee program will have no greater adverse environmental effect than that already anticipated in the 2004 program EIR and its adoption of a negative declaration. We conclude that CEQA requires a tiered EIR to be conducted prior to the County's adoption of the plan and fee program. Accordingly, we reverse the judgment.

## FACTUAL AND PROCEDURAL HISTORY

In setting forth the factual and procedural background of the case, we draw extensively on Judge Kingsbury's carefully prepared statement of decision.

In 1996, the County's Board of Supervisors (Board) adopted a general plan that was challenged in Sacramento County Superior Court on grounds that included the claim that its "canopy cover retention standards did not adequately address impacts to the oak woodland canopy." (*El Dorado County Taxpayers for Quality Growth v. El Dorado County Bd. of Supervisors* (Super. Ct. Sac. County, 1996, No. 96 CS01290.) In 1999, the superior court ruled the 1996 general plan's EIR deficient and placed a moratorium on development in the County until another general plan was adopted.

In 2002, a study on impacts on wildlife in western El Dorado County under the 1996 general plan was conducted by Saving and Greenwood. A separate study by Harris and Kocher, also in 2002, analyzed protections afforded oak woodlands under the 1996 general plan. That study noted that "while there is a great deal of concern about the protection of oaks and other hardwoods in California" there is a lack of statewide regulation on the issue, which is left to local government in the absence of additional factors, such as the presence of streams, wetlands or endangered species in the habitat.

### The County's 2004 Program EIR

In 2004, the County adopted a new general plan and program EIR. The program EIR acknowledged that development in the County under the new general plan would have "significant and unavoidable" impacts on the

County's oak woodland habitat and its dependent wildlife. To mitigate the adverse effects of development, the County planned to formulate an integrated natural resources management plan (integrated plan) within five years of the 2004 General Plan's adoption.

Program EIR's are used for a series of related actions that can be characterized as one large project. (Guidelines, § 15168.) The 2004 General Plan's 20-year planning horizon anticipates county growth by 30,000 households and "represents a workable compromise on land use issues with which the County has grappled for over 15 years." In its effort to balance competing goals, the Board recognized that "several significant environmental impacts have not been fully mitigated because of the need to meet competing concerns, and/or the need to recognize economic, legal, social, technological and other issues as factors in decision-making. Accordingly, the Board has chosen to accept certain adverse environmental impacts because to eliminate them would unduly compromise important economic, social, technological, and other goals" and "because the benefits of the project outweigh any significant and unavoidable or irreversible adverse environmental impacts of the project."

"Conservation of Oaks and other Hardwoods" was considered in section 5.12, "Biological resources," of the program EIR, which recognized the loss and fragmentation of wildlife habitat as a result of urbanization: "Development under the General Plan would result in substantial increase in urban development and population in the western foothill region of the county. . . . Much of the native habitat that exists would be substantially reduced by impacts associated with adoption of the General Plan. . . . Impacts are expected to be highest in areas designated as high-intensity land uses, because buildout of land under these designations would likely result in fragmentation and loss of the majority of the existing habitat. Medium-density land uses would also result in removal and fragmentation of existing habitat, but to a lesser extent than high-density land uses. As a result, some habitats would expect to continue to be viable, but the quality would be diminished compared with keeping the habitat in an undisturbed condition. Low-intensity land uses would have little or no effect on existing biological resources because in most areas the habitats would not be substantially altered. . . . Most of the development pressure in El Dorado County is likely to occur in the foothills near the U. S. [Highway] 50 corridor."

The 2004 General Plan designates as objective 7.4.4 the "[p]rotect[ion] and conser[vation of] forest and woodland resources for their wildlife habitat, recreation, water production, domestic livestock grazing, production of a sustainable flow of wood products, and aesthetic values." (Boldface omitted.)

The plan lists five policies toward that objective. Two policies are relevant here: policy 7.4.4.4 and policy 7.4.2.8.

Policy 7.4.4.4 provides that the new development projects as defined require one of two mitigation options. Under Option A, the project applicant adheres to the canopy retention standards described in the policy and "shall also replace woodland habitat removed at [a] 1:1 ratio . . . based on a formula, developed by the County, that accounts for the number of trees and acreage affected." Option A also provides, "Impacts on woodland habitat and mitigation requirements shall be addressed in a Biological Resources Study and Important Habitat Mitigation Plan as described in Policy 7.4.2.8." Under Option B, the project applicant pays into the County's integrated plan's conservation fund (described in policy 7.4.2.8) to "fully compensate" for the impact to oak woodland habitat. This fee is intended to mitigate the impact of both habitat loss and habitat fragmentation: the mitigation ratio is two to one and is " 'based on the total woodland acreage onsite directly impacted by habitat loss and indirectly impacted by habitat fragmentation.' If an applicant attempts Option A but falls short, Option B fees would be charged only on the difference between what should have been preserved under the [oak woodland management plan] and what the applicant was able to preserve utilizing Option A."

Policy 7.4.2.8 requires the development and implementation (within five years) of an integrated plan "that identifies important habitat in the County and establishes a program for effective habitat preservation and management." This policy implements objective 7.4.2, the identification and protection of critical fish and wildlife habitat "[t]o the extent feasible in light of other General Plan policies." (Policy 7.4.2.1.) The integrated plan includes a number of components: the inventory and mapping of a variety of important biological habitats, with review and updating every three years; development of a habitat protection strategy for the identified important habitats with a goal of "conserv[ing] and restor[ing] contiguous blocks of important habitat to offset the effects of increased habitat loss and fragmentation elsewhere in the county"; establishment of "a program to facilitate mitigation of impacts to biological resources resulting from projects approved by the County that are unable to avoid impacts on important habitats"; establishment of "a program for identifying habitat acquisition opportunities involving willing sellers"; evaluation of acquired properties for suitability for habitat management or restoration actions; and the establishment of a habitat monitoring program "that covers all areas under the Ecological Preserve overlay together with all lands acquired as part of the [integrated plan]." (Policy 7.4.2.8.)

Pending completion of the integrated plan, the County required residential and commercial real estate developers to mitigate the loss of oak woodland habitat by conforming to Option A. Option A requires developers of more than 10 acres to set aside oak woodlands on a one-to-one ratio. The 2004 General Plan anticipated that an alternative, Option B, would allow developers to pay a conservation fee under an oak woodland management plan instead of engaging in onsite mitigation. The 2004 program EIR did not set the Option B fee rate or determine how the collected funds would be used to mitigate the impact of development on the County's oak woodlands.

### 2006 Settlement Agreement

Following the adoption of the 2004 General Plan and program EIR, the County filed a return to the writ that had been issued in 1999. The adequacy of the County's return was challenged by a varied group of petitioners.[2] The superior court ruled in the County's favor and discharged the writ. Petitioners filed a notice of appeal, and while the appeal was pending the County and the petitioners entered into a settlement agreement in April 2006 (Agreement). In exchange for petitioners abandoning their appeal, the County agreed not to seek costs from petitioners. The Agreement contained additional terms including the following:

"Recital D. One of the issues raised in the Return to the Writ phase of the litigation concerned the effort of General Plan Policy 7.4.4.4, which relates to the protection of oak woodlands. It is the County's position, consistent with the position the County maintained in the litigation and with which the trial court agreed, that under existing Policy 7.4.4.4, the County may require development projects to undertake mitigation Option B (contribution to conservation fund) in lieu of Option A (canopy retention standards) only after the County has adopted the oak woodland portion of the [integrated plan] described in General Policy 7.4.2.8. [¶] . . . [¶]

"Agreement 3. The County agrees to maintain its interpretation of General Plan Policy 7.4.4.4 as described in the above recitals unless and until that policy is amended or repealed."

---

[2] As in this case, El Dorado Taxpayers for Quality Growth was a petitioner. The remainder of the petitioners challenging the return in April 2006 were the League to Save Sierra Lakes, Environmental Planning and Information Council of Western El Dorado County, Inc., Friends Aware of Wildlife Needs, Safegrow, California Native Plant Society, Plasse Homestead Homeowners' Association, Caples Lake Homeowners Association, Kit Carson Lodge, Plasse's Resort, Caples Lake Resort, Sorensen's Resort, Kirkwood Meadows Public Utilities District, Northern Sierra Summer Homeowners' Association, South Silver Lake Homeowners' Association, Alpine County, California Sportfishing Protection Alliance, and Sierra Club.

*The Oak Woodland Management Plan*

In 2008, the Board adopted an oak woodland management plan (including an Option B fee program) that allowed developers to pay 40 percent of fee title value of the land under the oak canopies to be removed. The Board's adoption of the oak woodland management plan and Option B was based on a negative declaration. Thus, the County did not prepare an EIR for the oak woodland management plan or the Option B fee program.

Development of the oak woodland management plan began with mapping existing oak woodlands and then identifying conservation priorities within those woodlands. The oak woodland management plan was conceived as the oak woodland portion of the integrated plan, which would look at many resources, including creeks, endangered species, sensitive habitat, and rare plants. Its purpose is to identify the highest priority habitat areas for protection and preservation. The County chose to begin the integrated plan with the oak woodland portion of the plan.[3]

Mapping oak woodlands "picked up where the [program] EIR left off." The program EIR oak woodland mapping was based on mapping done by the California Fire and Resource Assessment Program; woodland habitat types had been identified using Department of Fish and Game definitions. The oak woodland management plan had three purposes: (1) to include the components required to be included by measure CO-P[4]; (2) to "develop the Policy 7.4.4.4 Option B Fee Method for mitigating impact to the Oak Woodlands"; and (3) to develop an oak woodland management plan that would represent the initial component of the integrated plan.

A series of "filters" were used to prioritize those areas with the highest biological habitat value. Valley oak woodlands were identified with a specific designation of sensitive habitat. Then, based on considerations of habitat continuity and fragmentation, the focus was on "oak woodlands that were within areas that represented blocks of 500 acres or larger areas." Some

---

[3] Moving the project forward was a major concern of the Board. Chairman Baumann's comments are typical: "[T]hrough all of the direction and everything that we've been working on, the direction of this Board has been to get this portion of the [integrated plan] done. . . . And so it's not being de minimus to important habitat or the [integrated plan] or anything that we're going to be looking at later. We're simply trying to move a portion of that so that we are no longer holding people hostage and they have their Option B." It was recognized that "the Oak Woodland chapter" of the integrated plan might change somewhat as the broader integrated plan developed to cover other biological resources. The oak chapter would be "a stand-alone chapter until the rest of [the integrated plan] is developed."

[4] The County's 2004 General Plan's implementation plan contains measure CO-M, which would develop and implement the integrated plan consistent with policy 7.4.2.8 and measure CO-P, which would develop and implement an oak woodland management plan.

higher value oak woodland parcels that were 40 acres or larger were also considered for preservation, whether or not developed, because of their value in preventing fragmentation. Areas designated in the 2004 General Plan as community regions and rural centers or were designated industrial or commercial were excluded.

In developing the oak woodland management plan, the important biological corridors overlay was used and considered. The purpose of this overlay was the concern for habitat connectivity, i.e., "being able to provide ways for wildlife to move either through riparian corridors, or through other Oak Woodland corridors between some of these higher habitat value areas." While "there is some overlap of the Important Oak Woodland Habitat with the Important Biological Corridors," the correlation is not strong because "the Important Biological Corridors are intended to encompass much more than just Oak Woodlands. They're intended to encompass endangered species, wetlands, and many other issues." The Board directed staff "that the importance of the Oak Woodland plan relative to other types of habitat will be determined in the [integrated plan] and that Oak Woodlands by themselves are not necessarily important."

At the September 25, 2007, Board meeting, Rick Lind, president of EN2 Resources, a planning and environmental consulting firm retained by the County to assist with technical aspects of the oak woodland management plan, stated that the mapping process focused on two particular classifications, priority conservation areas and oak woodland corridors. Priority conservation areas are "areas of large expanses of Oak Woodland habitat as defined by the [integrated plan]"; "large expanses of native vegetation" is language used in policy 7.4.2.8A(5) and generally means 500-acre or larger blocks of contiguous habitat. Oak woodland corridors are "those areas that would provide the connectivity that is discussed in the [program] EIR and in the policies that are critical for maintaining the values and viability of Priority Conservation Areas."

The criteria used in selecting oak woodland corridors were (1) for each priority conservation area, there had to be at least two ways for wildlife to move in or out; (2) large expanses of oak woodland were selected that did not meet the priority conservation area criteria, typically because they were under 500 acres in size; and (3) integrated plan criteria, such as year-round water, wetlands, and riparian habitat. They concluded that perennial stream zones would be appropriate areas for focusing on connectivity. Two particular corridors for north-south connectivity were identified: Weber Creek and "a second area along Slate Creek in the vicinity of the Greenstone undercrossing" which represented "the highest value second corridor that would link the [priority conservation areas] in the north with the [priority conservation areas]

in the south." All together there are 19 corridors, all of which are along existing streams. Public lands were specifically targeted, where feasible, as pathways between priority conservation areas.

While a significant percentage of oak woodlands is contained within important biological corridors, habitat connectivity was not a focus of the oak woodland management plan. In accordance with the Board's direction that habitat connectivity issues be considered in connection with development of the integrated plan and not the oak woodland management plan, the oak woodland management plan's focus was to identify and preserve oak woodlands. The oak woodland management plan "emphasize(s) time and time again that these are preliminary delineations of potential corridors that are going to be evaluated and probably revised significantly through the [integrated plan process]. But . . . with the objective of meeting the [integrated plan] portion of the Oak Woodland Plan, making that fulfill that requirement, we felt it was necessary to establish that connectivity between the [priority conservation areas]."

The County issued a final oak woodland management plan on February 11, 2008, and circulated the negative declaration for comments. The County planning commission found that there would be no significant environmental impacts that had not been previously examined and that the oak woodland management plan was consistent with the 2004 General Plan.

At the May 6, 2008, session, the Board considered the oak woodland management plan negative declaration and implementation ordinance and approved the findings of the planning commission at the March 18, 2008, meeting, certified the environmental document, and adopted the oak woodland management plan as amended and the implementation ordinance as amended.

### Present Litigation

The Center petitioned for a writ of mandate in El Dorado County Superior Court in June 2008 to challenge the County's adoption of the oak woodland management plan and the Option B fee program as contrary to CEQA as well as the County's 2004 General Plan. The trial court denied the petition in February 2010. The Center timely filed a notice of appeal from the subsequent judgment.

### DISCUSSION

The issue is whether CEQA requires an EIR to be prepared prior to the County's adoption of the oak woodland management plan, including the Option B fee program. As we shall explain, the answer is yes.

# I

## *CEQA Overview*

### *Purpose*

■ As this court has previously explained, "[t]he purpose of CEQA is to protect and maintain California's environmental quality. With certain exceptions[5] CEQA requires public agencies to prepare an EIR for any project they intend to carry out or approve whenever it can be fairly argued on the basis of substantial evidence that the project may have a significant environmental effect . . . ." (*Communities for a Better Environment, supra,* 103 Cal.App.4th at pp. 106–107, fns. omitted.) The California Supreme Court has "repeatedly recognized that the EIR is the 'heart of CEQA.' [Citations.] 'Its purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR "protects not only the environment but also informed self-government." ' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502], original italics.)

### *Project*

■ Public agencies must "prepare, or cause to be prepared by contract, and certify the completion of, an [EIR] on any project that they intend to carry out or approve which may have a significant effect on the environment." (§ 21151, subd. (a).) Section 21065 defines "project" to include "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] . . . [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." The Guidelines further define project as "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following: [¶] . . . [¶] (3) An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public

---

[5] As the California Supreme Court has noted, certain projects are exempted from CEQA requirements by statute or by falling within the category of projects unlikely to have any significant environmental effects. (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112–113 [65 Cal.Rptr.2d 580, 939 P.2d 1280] (*Mountain Lion Foundation*).) No statutory or categorical exemption applies here. (See *id.* at p. 113 [holding that CEQA applies to require an EIR "[w]henever a project may have a significant and adverse physical effect on the environment . . . ."])

agencies." (Guidelines, § 15378, subd. (a)(3).) Under CEQA, " ' "Project" is given a broad interpretation . . . to maximize protection of the environment.' " (*RiverWatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186, 1203 [88 Cal.Rptr.3d 625], quoting *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439].)

Nonetheless, "the broad definition of project is tempered by the requirement that CEQA applies only to those activities which 'may have a significant effect on the environment.' " (*Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 471 [11 Cal.Rptr.2d 792].) Thus, " '[w]here it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA.' (Guidelines, § 15061, subds. (a), (b)(1)[, ](2)[, ](3).)" (*Ibid.*)

### Initial Study

██ To determine whether an EIR is required for a project, an agency "generally must 'conduct an initial study to determine if the project may have a significant effect on the environment' unless the lead agency 'can determine that an EIR will clearly be required for the project. . . .' (Guidelines, § 15063, subd. (a).) The initial study as a standardized document 'is largely a creature of the Guidelines . . .' and 'CEQA refers to [an initial study] only glancingly (e.g., § 21080, subd. (c)(2)).' (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1376 [43 Cal.Rptr.2d 170].) It is now well established, however, that an initial study is the preliminary environmental analysis (see Guidelines, § 15365) and its purposes include '[p]rovid[ing] the lead agency with information to use as the basis for deciding whether to prepare an EIR or negative declaration,' '[e]nabl[ing] an applicant or lead agency to modify a project, mitigating adverse impacts before an EIR is prepared, thereby enabling the project to qualify for a negative declaration,' and '[p]rovid[ing] documentation of the factual basis for the finding in a negative declaration that a project will not have a significant effect on the environment.' (Guidelines, § 15063, subd. (c)(1), (2), (5).)" (*Lighthouse Field Beach Rescue v. City of Santa Cruz* (2005) 131 Cal.App.4th 1170, 1180 [31 Cal.Rptr.3d 901].)

### Negative Declaration

██ " '[A]n agency may adopt a negative declaration only if there is no substantial evidence that the project 'may have a significant effect on the environment.' [Citations.]" (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist.* (1999) 71 Cal.App.4th 382, 389 [83 Cal.Rptr.2d 836], italics omitted; see *City of Redlands v. County of San Bernardino* (2002)

96 Cal.App.4th 398, 405 [117 Cal.Rptr.2d 582] (*City of Redlands*).) "The negative declaration is inappropriate where the agency has failed either to provide an accurate project description or to gather information and undertake an adequate environmental analysis. [(See *Sundstrom v. County of Mendocino* (1988) 202 Cal.App.3d 296, 311 [248 Cal.Rptr. 352]; *Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180, 197 [228 Cal.Rptr. 868].)] An accurate and complete project description is necessary for an intelligent evaluation of the potential environmental impacts of the agency's action. [(*Silveira v. Las Gallinas Valley Sanitary Dist.* (1997) 54 Cal.App.4th 980, 990 [63 Cal.Rptr.2d 244]; see also *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713, 730 [32 Cal.Rptr.2d 704]; *McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439]; *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193 [139 Cal.Rptr. 396].)] 'Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance.' [(*County of Inyo, supra*, 71 Cal.App.3d at pp. 192–193.)]" (*City of Redlands*, at p. 406, fns. omitted.)

### Program EIR

■ Under Guidelines section 15168, program EIR's are used for a series of related actions that can be characterized as one large project. If a program EIR is sufficiently comprehensive, the lead agency may dispense with further environmental review for later activities within the program that are adequately covered in the program EIR. (Guidelines, § 15168, subd. (c).) Thus, "a program EIR may serve as the EIR for a subsequently proposed project to the extent it contemplates and adequately analyzes the potential environmental impacts of the project . . . ." (*Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 615 [36 Cal.Rptr.3d 249].) However, "[a] program EIR does not always suffice for a later project. Sometimes a 'tiered' EIR is required (§ 21094) . . . ." (*Natural Resources Defense Council, Inc. v. City of Los Angeles* (2002) 103 Cal.App.4th 268, 282 [126 Cal.Rptr.2d 615].)

"CEQA directs agencies to 'tier' EIR's whenever feasible, in part to streamline regulatory procedures and eliminate repetitive discussions of the same issues in successive EIR's. (§ 21093; *Las Virgenes Homeowners Federation, Inc. v. County of Los Angeles* (1986) 177 Cal.App.3d 300, 307 [223 Cal.Rptr. 18].) Section 21068.5 defines 'tiering' as the 'coverage of general matters and environmental effects in an [EIR] prepared for a policy,

*plan, program* or ordinance followed by narrower or site-specific [EIR's] which incorporate by reference the discussion in any prior [EIR] and which concentrate on the environmental effects which (a) are capable of being mitigated, or (b) were not analyzed as significant effects on the environment in the prior [EIR].' (See Guidelines, § 15152, italics added.)

"Section 21094 states the procedure to be followed for tiered EIR's. Subdivision (a) provides in pertinent part: 'Where a prior [EIR] has been prepared and certified for a program [or] plan, . . . the lead agency for a later project that meets the requirements of this section shall examine significant effects of the later project upon the environment by using a tiered [EIR], except that the report on the later project need not examine those effects which the lead agency determines were . . . examined at a sufficient level of detail in the prior [EIR] . . . .' Of particular significance to the present appeal, subdivision (c) provides: 'For purposes of compliance with this section, an initial study shall be prepared to assist the lead agency in making the determinations required by this section. The initial study shall analyze whether the later project *may cause significant effects on the environment* that were not examined in the prior [EIR].' (Italics added.)" (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1318–1319 [8 Cal.Rptr.2d 473], fn. omitted.)

## II

### *Standard of Review*

As our high court has explained, "In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (. . . § 21168.5.) Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (§ 21168.5; see *Western States Petroleum Assn. v. Superior Court* [(1995)] 9 Cal.4th [559,] 568 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392–393 [253 Cal.Rptr. 426, 764 P.2d 278].)" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427 [53 Cal.Rptr.3d 821, 150 P.3d 709], fn. omitted.)

On appeal, our " ' " 'task . . . is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law.' [Citation.] . . ." ' (*Burrtec Waste Industries, Inc. v. City of Colton* (2002) 97 Cal.App.4th 1133, 1139 [119 Cal.Rptr.2d 410], fn. omitted.)" (*Inyo Citizens for Better Planning v. Inyo County Bd. of*

*Supervisors* (2009) 180 Cal.App.4th 1, 8 [102 Cal.Rptr.3d 522].) We engage in independent review of the administrative record and are not bound by the trial court's conclusions. (*Ibid.*)

If a proposed new activity is a separate project, the "fair argument" test should apply to an agency's decision whether to require a tiered EIR for the later project. (*Sierra Club v. County of Sonoma, supra,* 6 Cal.App.4th at p. 1320.) Under the fair argument test, "deference to the agency's determination is not appropriate and its decision not to require an EIR can be upheld only when there is no credible evidence to the contrary." (*Id.* at p. 1318.)

" 'A trial court therefore reviews an agency's decision to adopt a negative declaration using the "fair argument" test. Under this test, the agency must prepare an EIR whenever substantial evidence in the record supports a fair argument that a proposed project may have a significant effect on the environment. [Citations.] "If such evidence is found, it cannot be overcome by substantial evidence to the contrary." [Citations.] [¶] "The lead agency's determination is thus largely legal rather than factual; it does not resolve conflicts in the evidence but determines only whether substantial evidence exists in the record to support the prescribed fair argument." [Citation.] The court's "function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made." [Citation.]' [Citations.]" (*San Bernardino Valley Audubon Society v. Metropolitan Water Dist., supra,* 71 Cal.App.4th at p. 389, fn. omitted.) "If such evidence exists, [then] the court must set aside the agency's decision to adopt a negative declaration as an abuse of discretion in failing to proceed in a manner as required by law." (*City of Redlands, supra,* 96 Cal.App.4th at p. 405, fn. omitted.)

III

*The Trial Court Concluded an EIR Was Not Required for the*
*Oak Woodland Management Plan*

In ruling that an EIR was not required for the oak woodland management plan, the trial court explained: "[T]he [oak woodland management plan] is not an independent, stand-alone project. It is (1) a mitigation measure under the General Plan and (2) the first component of a much larger [integrated plan]. Under . . . § 21166 and Guideline 15162 no substantial changes have been identified that will require major revisions to the EIR 'due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects'; there are no changes required 'due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified

significant effects[']; and there is no 'new information of substantial importance which was not known or could not have been known at the time the previous EIR was certified.['] The impacts are adequately addressed in the General Plan EIR. [¶] The Court finds that the County proceeded appropriately in adopting a Negative Declaration for the project. No new EIR was required."

The court further reasoned that "the County has not impermissibly deferred habitat considerations. In the absence of unlimited fiscal resources permitting simultaneous development of all phases of the [integrated plan], that plan has to begin somewhere and the County chose to begin with the [oak woodland management plan]. The Important Biological Corridors overlay was used in developing the [oak woodland management plan] as an interim measure to protect wildlife habitat pending the full [integrated plan]. The County's decision to prioritize is not a flaw in the process."

As to the adoption of the Option B fee program, the trial court found that the County based the fee on "(1) ease of implementation by the County; (2) the cost of the program to the County; (3) acceptance of the fee method and fee amount by land owners and developers; (4) resource protection and environmental values; and (5) consistency with the General Plan. Cost includes actual land acquisition, restoration for areas that may need replanting, erosion control, etc., as well as management, i.e., physical management activities on the land as well as costs of administration. A range of costs was developed, ranging from easement acquisition at the low end through acquisition of fee title at the high end. Based on the factors underlying the cost component, public comment and the evaluation of other data, the planning commission based the fee structure on acquisition of conservation easements and recommended the fee be reduced to 40 percent of fee title value. The Board adopted the planning commission's recommendation.

"The Board recognized that once the [oak woodland management plan] is in place, the fee might well have to be adjusted to comport with unfolding reality and represented 'kind of a mid-point, and we don't know until the program is actually implemented, and then it, you know, we may want to change it.' The Initial Study/Negative Declaration acknowledges that because of the annual review process, 'the In-Lieu fee amount can be initially established at any reasonable amount and then increased or decreased on an annual basis depending on the results of the annual program review.' "

## IV

### Whether the Oak Woodland Management Plan and Option B Fee Program Were Encompassed in the 2004 Program EIR's Analysis

The trial court's ruling tacitly acknowledges that the oak woodland management plan and the Option B fee program must be evaluated in an EIR *at some point* when it concluded the oak woodland management plan fell within the 2004 program EIR as "a mitigation measure under the General Plan." The County also appears to agree that the oak woodland management plan is subject to EIR analysis but—like the trial court—concludes that the plan was already adequately studied in the 2004 program EIR. As we shall explain, the record does not support this conclusion.

### A. Scope of the County's 2004 Program EIR

The 2004 program EIR noted that the impact of development anticipated in the 2004 General Plan would have "significant and unavoidable" effects to the County's oak woodland habitat. However, the 2004 program EIR did not assess how any mitigation measures other than Option A could lessen the impacts of development on the County's oak woodlands. Thus, the 2004 program EIR allowed oak woodlands to be cleared only if the developer preserved oaks onsite at a one-to-one ratio. The record shows that the sole availability of Option A to developers spurred the County to expedite the adoption of Option B. As the Board chairman noted, the oak woodland management plan was formulated "so that we are no longer holding people hostage and they have their Option B." The County worked "to expedite implementation of the Option B oak mitigation provisions of Policy 7.4.4.4" in the general plan.

Although the 2004 program EIR called for an Option B to be developed, it provided no guidance as to the fee rate or use to be made of the fees collected. The 2004 program EIR called for implementation of a mitigation fee program as follows: "**Option B** [¶] The project applicant shall provide sufficient funding to the County's [integrated plan] conservation fund . . . to fully compensate for the impact to oak woodland habitat. To compensate for fragmentation as well as habitat loss, the preservation mitigation ratio shall be 2:1 and based on the total woodland acreage onsite directly impacted by habitat loss and indirectly impacted by habitat fragmentation. The costs associated with acquisition, restoration and management of the habitat protected shall be included in the mitigation fee. Impacts on woodland habitat

and mitigation requirements shall be addressed in a Biological Resources Study and Important Habitat Mitigation Plan . . . ."

The 2004 program EIR anticipated that a subsequent study would inform the County regarding its implementation of Option B. The County's master response to comments in response to the 2004 program EIR stated that it "would permit only retention in accordance with the specified standards of Option A (which do not allow 'replacement' in lieu of retention) *until the [integrated plan] is developed* and a program established for funding the 2 [to] 1 replacement requirements under Option B." (Italics added.)

The settlement agreement following the legal challenge to the 2004 General Plan confirmed the County's understanding that formation of an Option B fee program lay beyond the scope of the 2004 program EIR when it noted, "It is the County's position, consistent with the position the County maintained in the litigation and with which the trial court agreed, that under existing Policy 7.4.4.4, the County may require development projects to undertake mitigation Option B (contribution to conservation fund) in lieu of Option A (canopy retention standards) *only after* the County has adopted the oak woodland portion of the [integrated plan]." (Italics added.)

The consultant who prepared the oak woodland management plan reported that "the County and the [oak woodland management plan] Consultant Team understand that CEQA requirements for the [oak woodland management plan] and associated tasks can be satisfied through an Initial Study/Negative Declaration process *that is tiered from the County's 2004 [program] EIR.*" (Italics added.) And, county counsel informed the Board that adoption of the oak woodland management plan was a "project" within the meaning of CEQA when county counsel reported that "the adoption of an Oak Woodland management plan is a discretionary action subject to CEQA." The initial study itself acknowledges that "the project is identified as the implementation of the County's [oak woodland management plan], which meets the definition of 'project' as described in Section 15378 of the State CEQA Guidelines."

Here, the administrative record shows that the 2004 General Plan and program EIR called for mitigation measures to minimize the impact of regional development on the County's oak woodland habitats by offering developers Option A and calling for the formulation of an Option B fee program. However, neither the general plan nor the program EIR included the necessary details for implementing Option B, including specifying the fee rate, the parcels for which the fee would be required prior to development, or the uses for which the fee would be employed by the County.

In conceiving the project, the County selected the type of oak woodlands to be targeted for preservation, how oak woodlands slated for elimination would be measured, the conservation fee rate, and priorities for using the funds generated by the new fee program. We discuss these discretionary determinations for the oak woodland management plan and Option B fee program in turn.

### B. *Selection of "Important" Oak Woodlands*

Among the choices incorporated in the oak woodland management plan is the plan's focus on mitigation measures primarily to valley oak woodlands rather than to woodlands composed primarily of blue oaks or interior live oaks (or even other hardwood species). The oak woodland management plan declares: "*Only* Valley Oak Woodlands will be targeted . . . ensuring that this General Plan-designated 'sensitive habitat' is adequately preserved. If the Valley Oak Woodland habitat within currently designated [priority conservation areas] becomes insufficient, then additional acreage of this habitat type will be added . . . as necessary upon annual review . . . . [¶] . . . This approach is considered superior to one that attempts to conserve oak woodlands in areas designated for development." (Italics added.)

By contrast, the 2004 program EIR did not differentiate between oak species when it announced that "[o]ak and other hardwood habitats at mid-elevations are important for a large percentage of the wildlife species in El Dorado County." That EIR, however, did note that the County also was home to blue oak and interior live oak species. The preliminary draft of the oak woodland management plan contains a map showing the County has approximately 3,400 acres of valley oak woodlands, 12,000 acres of blue oak/foothill pine habitat, and 42,000 acres of predominantly blue oak woodlands. Thus, the oak woodland management plan's focus on valley oak habitats excludes the vast majority of oak woodlands in the County from the mitigation measures to be funded by the Option B fee.

The oak woodland management plan prioritizes valley oaks over blue and interior live oak species without the benefit of an EIR even though the 2004 program EIR mentioned all three species (along with Northern California black walnut) as part of the County's most important wildlife habitats. Such discretionary action required an EIR to inform the County of the environmental consequences before it adopted the oak woodland management plan. As the California Supreme Court has emphasized, the EIR requirement's "purpose is to inform the public and its responsible officials of the environmental consequences of their decisions *before* they are made. Thus, the EIR 'protects

not only the environment but also informed self-government.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161], quoting *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 392 (*Laurel Heights*).)

#### C. *Measurement Methodology for Oak Woodlands*

The 2004 program EIR did not determine the measurement metric for conservation of oak woodlands to be used under Option B. Oak woodland areas may be measured by tree canopy cover or by total area that includes the space between canopies. The initial study adopted oak canopy as the measurement of area "[f]or the purposes of mitigation." Measuring tree canopy alone may make a substantial difference in the amount of habitat to be preserved because oak woodlands "range in structure from open savannah to dense forest." Measurement methodology may also have a large effect on how much developers have to pay under Option B to mitigate the loss of oaks on their parcels.

The County did not prepare an EIR to assess the effect of measuring mitigation based on canopy coverage in the oak woodland management plan for Option B. Whether preservation of oak woodlands was governed by canopy measurement or by habitat including the area between oaks is a significant factor that will affect mitigation. The initial study acknowledges that the selection of the measurement methodology will affect the mitigation: "By basing the avoidance and mitigation calculation for Option A on only the oak trees within a stand, any impacts to the broader oak woodland habitat are fully not addressed. Option A was interpreted in this manner since the intent of Option A with regard to applicability to oak canopy versus broader woodlands was unclear and because the specific definitions of oak woodlands and related policy decisions would occur through the [oak woodland management plan]. Now that a draft [oak woodland management plan] is completed, it is an appropriate opportunity to revisit this issue as part of your Board's deliberations."

■ Determination of the measurement methodology is the type of discretionary choice that must be informed by an EIR.

#### D. *Option B Fee Rate*

The 2004 program EIR anticipated that Option B would allow developers to pay a fee to mitigate the loss of oak woodlands on parcels to be developed.

The County's master response to comments on the 2004 program EIR acknowledged that Option B "would allow for greater loss of canopy on individual parcels" but that the loss would be offset by a "conservation fund" that would allow "acquisition and restoration projects that would produce the greatest biological benefits." However, the 2004 program EIR did not set the fee rate or determine what type of parcels would be required to pay the fee prior to development.

Preparations for the oak woodland management plan by the County show restoration cost estimates ranging from a low of $2,000 per acre for replanting oak trees to more than $16,000 per acre for repair of severely degraded habitat. The County further noted differing scenarios for use of Option B funds—from acquisition only of easements, to a 50/50 mix of easement and fee title purchases, to exclusively purchasing fee title to oak woodlands for preservation.

The County's planner noted the difference of opinion regarding the appropriate Option B fee rate: "There was disagreement on which Rural/Urban ratio to use in making the fee calculation. [¶] The consultant recommends the low level of acquisition, management, and restoration . . . the 80% Rural/20% Urban Acquisition for a fee of $14,000 per acre of required mitigation. . . . [¶] At its April 26, 2007 meeting, the Planning Commission indicated that it preferred the lowest fee of . . . 100% Rural Land Acquisition. [¶] Development Services staff recommends that your Board accept the Low-Cost Scenario [with a $14,000 fee per acre] as the appropriate fee amount for the off-site mitigation under Option B." The County's planner explained that the Option B fee amount adopted represented "a compromise between the 25% requested by some commenters and the staff-recommended 80% of fee title value." Nonetheless, the mitigation fee rate and land acquisition options were not analyzed by an EIR that considered the environmental effects of the options.

■ The requirement of an EIR for a fee program was discussed in *California Native Plant Society v. County of El Dorado* (2009) 170 Cal.App.4th 1026 [88 Cal.Rptr.3d 530] (*California Native Plant Society*). In holding that an EIR was required to properly review a fee program, this court observed: "A comprehensive preservation program funded by impact fees may be a sound or even essential strategy for mitigating some development impacts, and the California Supreme Court, this court, and other appellate courts have held that such fees *may* adequately mitigate environmental impacts. (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2d ed. 2008) Mitigation Measures, § 14.19, pp. 703–704.) But CEQA is focused on 'the effects of projects on the actual environment upon which the proposal will operate.' (*Environmental Planning &*

*Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 354 [182 Cal.Rptr. 317].) Thus, to be considered adequate, a fee program at some point must be reviewed under CEQA, either as a tiered review eliminating the need to replicate the review for individual projects, or on a project-level, as-applied basis. . . . Because the fees set by the ordinance have never passed a CEQA evaluation, payment of the fee does not presumptively establish full mitigation for a discretionary project." (*Id.* at p. 1030.) Consistent with *California Native Plant Society*, the County's Option B fee program required preparation of an EIR prior to its adoption.

### E. *How Option B Fees Will Be Used by the County*

The County's 2004 program EIR did not specify how the fees collected should be used to preserve the County's oak woodlands. However, that EIR did declare that "[p]riority will also be given to parcels that would preserve natural wildlife movement corridors such as crossings under major roadways (e.g., US [Highway] 50 and across canyons)." Thus, the 2004 program EIR emphasized the importance of connectivity among preserved oak woodlands.

In formulating the oak woodland management plan, the County's planner informed the Board that "it is necessary to recognize the concept of connectivity, in the form of corridors, to ensure that the oak woodlands that will be preserved in the future through the mitigation program will also be able to function as habitat. Therefore, oak woodland corridors have now been illustrated on the final map for your Board's consideration. . . . [¶] . . . Without corridors, fragmentation of habitat will result. Fragmentation results in the degradation of habitat and ecosystem values." The initial study for the oak woodland management plan acknowledges, "In El Dorado County, Highway 50 presents a major barrier to north-south wildlife dispersal [citation]. The Oak Woodland Technical Advisory Committee that was formed in the County in 1996 'concluded that connectivity of woodlands from north to south was an important value to preserve and that it was at risk from future development.' "

In adopting the oak woodland management plan, the Board deferred the issue of "[c]onnectivity between the various habitat types, including oak woodlands" until "other components of the [integrated plan] are developed, which will look at the whole ecosystem." By excluding the Highway 50 corridor from Option B fund mitigation goals, the County allowed for a fee rate at the lower end of the range due to the lesser cost of rural land and easement acquisition. By specifying that Option B mitigation funds would not be spent on conservation in that corridor, the oak woodland management plan differs from the 2004 program EIR's emphasis on the importance of protecting connectivity of habitat across the Highway 50 corridor. These decisions

on the adequacy of the Option B mitigation goals and fee structuring must be made with the benefit of an EIR.

In sum, based on the facts of this case and *California Native Plant Society, supra*, 170 Cal.App.4th 1026, the County's oak woodland management plan and Option B fee program required preparation of an EIR prior to adoption.

V

*Whether the County Could Defer EIR Analysis of the Oak Woodland Management Plan Until Adoption of an Integrated Plan*

■ Compliance with the CEQA requirement of an EIR must precede project approval. On this point our high court has explained, "A fundamental purpose of an EIR is to provide decision makers with information they can use in deciding *whether* to approve a proposed project, not to inform them of the environmental effects of projects that they have already approved. If postapproval environmental review were allowed, EIR's would likely become nothing more than *post hoc* rationalizations to support action already taken. We have expressly condemned this use of EIR's." (*Laurel Heights, supra*, 47 Cal.3d at p. 394.)

In this case, the trial court erred in assuming that EIR analysis for the oak woodland management plan could be postponed until formulation of the integrated plan had been completed. Approval occurs when a public agency decision commits to a definite course of action. (Guidelines, § 15352, subd. (a).) The County's approval of the oak woodland management plan had the effect of allowing developers to pay a mitigation fee instead of preserving a substantial population of trees onsite. The County's plan to review the Option B fee rate following its approval did not comport with the CEQA requirement that an EIR inform the formulation and approval of the program. (*California Native Plant Society, supra*, 170 Cal.App.4th at p. 1030; see also *Laurel Heights, supra*, 47 Cal.3d at p. 394.) Annual review of the fee rate does not constitute a *prior* assessment of whether the mitigation plans for which the Option B fees were slated are sufficient to mitigate the environmental impact to the extent contemplated in the 2004 program EIR. (*Laurel Heights, supra*, 47 Cal.3d at p. 394.) Thus, the trial court's reasoning that the oak woodland management plan "deserves a chance to be tested in the real world" lies at odds with the California Supreme Court's admonition to conduct EIR review before approval of a project. (*Ibid.*)

## VI

### *Whether the County Properly Issued a Negative Declaration for the Oak Woodland Management Plan*

The Center contends the County violated CEQA by issuing a negative declaration for the oak woodland management plan and Option B fee program because the administrative record supports a fair argument that significant environmental effects will occur as a result of the program. We agree.

 Under the Guidelines, a public agency may forego EIR analysis by adopting a negative declaration when "[t]he initial study shows that there is no substantial evidence, in light of the whole record before the agency, that the project may have a significant effect on the environment . . . ." (Guidelines, § 15070, subd. (a).) On this point, the California Supreme Court has explained that "an activity that may have a significant effect on the environment cannot be categorically exempt. (Cf. Guidelines, § 15061, subd. (b)(3) [CEQA applies only to projects having potential for causing significant effect on environment; where no possibility that activity will have significant effect, activity not subject to CEQA].)" (*Mountain Lion Foundation, supra,* 16 Cal.4th at p. 124.)

The 2004 program EIR noted that even with the anticipated mitigation measures of Options A and B "and other proposed mitigation measures in place, impacts would not be reduced to a less-than-significant level." However, the County's subsequent negative declaration[6] for the oak woodland management plan and Option B fee program concludes: "Cumulative impacts would be **less than significant.**"

The negative declaration in the oak woodland management plan's initial study does not seem intended to foreclose all EIR review for the effects of the project. Instead, the initial study explains that the oak woodland management plan "is not a plan to address wildlife connectivity issues. Wildlife connectivity issues, including the north/south Highway 50 corridor of concern, will be

---

[6] An agency may also adopt a *mitigated* negative declaration when "[t]he initial study identifies potentially significant effects, but: [¶] (1) Revisions in the project plans or proposals made by or agreed to by the applicant before a proposed mitigated negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur, and [¶] (2) There is no substantial evidence, in light of the whole record before the agency, that the project as revised may have a significant effect on the environment." (Guidelines, § 15070, subd. (b).)

In this case, the County did not adopt a mitigated negative declaration and does not argue that the oak woodland management plan or the Option B mitigation fee program was permissible with a mitigated negative declaration.

thoroughly addressed in the [integrated plan]." The initial study further explained that "[e]arly drafts of the [oak woodland management plan] included corridors for habitat connectivity between [priority conservation areas], including north-south corridors across Highway 50. Corridors were subsequently dropped from the plan and have been deferred to the County's [integrated plan] process. In the interim, the County will use the General Plan-designated [important biological corridors] and other existing policies (e.g., stream setbacks) to meet the connectivity objectives of the [oak woodland management plan]. . . . Temporary oak woodland habitat corridors were considered unnecessary and undesirable given that the [integrated plan] will address corridors on a comprehensive basis."

The initial study acknowledges that the 2004 program EIR "identified the loss of oak woodlands as a significant impact requiring mitigation to reduce the severity of the impacts" and the oak woodland management plan was "prepared as a mitigation measure to offset the loss of oak woodland habitat in El Dorado County." While the initial study notes that "[c]umulative impacts to the environment from [the oak woodland management plan] would generally be beneficial as oak woodland habitat is preserved over time," the initial study also acknowledges that the oak woodland project will have an effect on the environment in the County: "The [oak woodland management plan] creates oak woodland conservation areas and replaces lost oak canopy through mitigation plantings on individual projects." Nonetheless, the initial study for the oak woodland management plan and the Option B fee program finds that "the proposed project **COULD NOT** have a significant effect on the environment, and a **NEGATIVE DECLARATION** will be prepared."

Based on the record, the County did not comply with CEQA when it adopted a negative declaration for the oak woodland management plan and the Option B fee program. The adoption of the oak woodland management plan allowed oak woodlands to be cleared from a parcel in return for payment of a fee. Prior to adoption of the project, oak woodlands were required to be preserved at a one-to-one ratio onsite under Option A. The County's approach of assessing the effectiveness of the project on an annual basis invites the possibility that the project will eventually prove inadequate to protect important habitat. Here, the oak woodland project did not have the benefit of an EIR to determine whether it is likely to succeed in achieving its goals.

On appeal, the County does not assert that the oak woodland management plan and Option B fee program will have no effect on the environment. Instead, the County argues that the 2004 program EIR's recognition of significant adverse effects to oak woodlands from development according to the 2004 General Plan means that any significant adverse effects from the oak woodland management plan have already been taken into account. Specifically, the County asserts that the 2004 program EIR "recognized there would

be a significant loss of oaks, directed the County to prepare an Oak Resources Management Plan to mitigate for that loss, and concluded that even after the County did so, there would still be significant unavoidable impacts due to the residential, commercial and agricultural growth that was anticipated over the next 20 years." Thus, the County concludes the adoption of the oak woodland management plan will have no greater adverse environmental effect than that already anticipated in the 2004 General Plan and program EIR. We disagree.

As this court has previously explained, "CEQA nowhere calls for evaluation of the impacts of a proposed project on an existing general plan; it concerns itself with the impacts of the project on the environment, defined as the existing physical conditions in the affected area. The legislation evinces no interest in the effects of proposed general plan amendments on an existing general plan, but instead has clearly expressed concern with the effects of projects on the actual environment upon which the proposal will operate." (*Environmental Planning & Information Council v. County of El Dorado, supra,* 131 Cal.App.3d at p. 354 (*EPIC*).)

Subsequent case law concurs " 'that, in assessing the impacts of a project proposed for an undeveloped piece of property, agencies should compare project impacts against the *existing environment,* rather than some hypothetical, impacted future environment that might occur without the project under existing general plan and/or zoning designations.' (Remy et al., Guide to the Cal. Environmental Quality Act (10th ed. 1999) p. 165 . . . .)" (*Woodward Park Homeowners Assn., Inc. v. City of Fresno* (2007) 150 Cal.App.4th 683, 709–710 [58 Cal.Rptr.3d 102].)

Here, the administrative record supports a fair argument that the oak woodland management program and Option B fee program will have a potentially significant effect on the environment. Most notably, the initial study yielding the negative declaration itself acknowledges potentially significant effects on the environment as a consequence of the County's adoption of the oak woodland project. That the preceding 2004 program EIR contemplated adverse environmental impacts resulting from development under the 2004 General Plan does not remove the need for a tiered EIR for the oak woodland management plan. As the California Supreme Court has noted, "a *program* EIR is distinct from a *project* EIR, which is prepared for a specific project and must examine in detail site-specific considerations." (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1169 [77 Cal.Rptr.3d 578, 184 P.3d 709].) Here, the specific project—the oak woodland management plan (including Option B fee program)—required a tiered EIR to examine its specific mitigation measures and fee rate.

The County may not shield all subsequent projects affecting the environment on the basis of its prior recognition that development and increased population will have an adverse effect on the region's oak woodlands. (*EPIC, supra,* 131 Cal.App.3d at p. 355; *Woodward Park Homeowners Assn. Inc. v. City of Fresno, supra,* 150 Cal.App.4th at pp. 709–710; see also *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 246 [227 Cal.Rptr. 899] [holding that public agency must consider environmental impact of rezoning on existing environment rather than merely comparing relative differences between old zoning and proposed new zoning].) Thus, an EIR was required to consider the effects of the oak woodland management plan and Option B fee program on the environment as it existed with only Option A available to developers in El Dorado County.

The negative declaration for the oak woodland project would have the effect of insulating the project from any subsequent EIR analysis. Even if the County were to complete its integrated plan (after the oak woodland management plan), any EIR required for that plan would not need to assess the environmental impacts of the oak woodland management plan (including Option B fee program) after it had been adopted with a negative declaration. Such a result does not comply with CEQA. (*League for Protection of Oakland's etc. Historic Resources v. City of Oakland* (1997) 52 Cal.App.4th 896, 903–905 [60 Cal.Rptr.2d 821]; *California Native Plant Society, supra,* 170 Cal.App.4th at p. 1030.) Because the 2004 program EIR did not adequately cover the Option B mitigation fee program, CEQA requires the County to prepare a tiered EIR for its oak woodland management plan that includes the Option B fee program prior to its adoption of the plan. Therefore, we reverse the trial court's denial of the writ petition seeking compliance with CEQA's requirement to prepare an EIR prior to the adoption of a project. (*League for Protection, supra,* at p. 909.)[7]

## DISPOSITION

The judgment is reversed and the case is remanded to the trial court with directions to enter a judgment granting the Center for Sierra Nevada Conservation, El Dorado County Taxpayers for Quality Growth, and California Oak Foundation's petition, and to issue a writ of mandate directing the County of El Dorado to set aside the initial study/negative declaration for the El Dorado County Oak Woodland Management Plan and related ordinance implementing Option B.

---

[7] Based on our conclusion that the County did not comply with CEQA, we do not need to address whether the trial court's judgment must be set aside on grounds that the oak woodland management plan conflicted with the County's 2004 General Plan.

Appellants (Center for Sierra Nevada Conservation, El Dorado County Taxpayers for Quality Growth, and California Oak Foundation) shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (3).)

Hull, Acting P. J., and Butz, J., concurred.