Filed 2/16/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HILLTOP GROUP, INC., et. al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF SAN DIEGO et. al., <br><br> Defendants and Respondents. | D081124 <br><br><br> (Super. Ct. No. 37-2021-00023554-CU-TT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Reversed and remanded.

Gatzke Dillon & Ballance, David P. Hubbard and Kendall F. Teal for Plaintiffs and Appellants.

Claudia G. Silva, County Counsel, and Joshua M. Heinlein, Deputy County Counsel, for Defendants and Respondents.

**INTRODUCTION**

The County of San Diego (County) designated a parcel of land for industrial use as part of its General Plan Update (GPU) in 2011.  Plaintiffs, Hilltop Group, Inc. and ADJ Holdings, LLC (collectively Hilltop Group), applied to develop the North County Environmental Resources Project

(NCER Project), a "construction, demolition, and inert debris . . . recycling facility," on the land. Based on its proximity to nearby residential communities, the NCER Project faced significant public opposition by community members, homeowners associations, and the nearby City of Escondido, all of whom expressed concern over the project's potential environmental impacts.

County staff required Hilltop Group to conduct environmental studies as part of its initial environmental review process under the California Environmental Quality Act (Pub. Resources Code, §21000 et seq.)[1] (CEQA). After Hilltop Group submitted a draft environmental impact report and supplemental environmental studies, staff for the County concluded that the NCER Project qualified for a CEQA exemption pursuant to section 21083.3 and its companion regulation, Guidelines section 15183. (Cal. Code Regs., tit. 14, § 15000 et seq.)[2] The County reached this conclusion through a Guidelines section 15183 exemption checklist that found the NCER Project was consistent with the GPU and did not impose significant and peculiar environmental impacts not already contemplated by the environmental impact report prepared for the GPU.

---

[1] Further statutory references are to the Public Resources Code unless otherwise stated.

[2] The administrative guidelines adopted by the Secretary of the California Natural Resources Agency to implement CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.) will be referred to as "Guidelines" followed by the section number. In their briefing on appeal, the parties primarily cite to Guidelines section 15183, which was promulgated by the authority in section 21083.3. (See *Lucas v. City of Pomona* (2023) 92 Cal.App.5th 508, 534 (*Lucas*).) Accordingly, we generally reference the Guidelines, rather than section 21083.3, throughout this opinion. Any reference to section 21083.3 in our discussion is intended to encompass Guidelines section 15183.

Multiple groups appealed the approval of the CEQA exemption to the Board of Supervisors. The Board of Supervisors conducted a public hearing at which staff for the County's Planning and Development Services (PDS) presented findings that the NCER Project qualified for the streamlined environmental review process in Guidelines section 15183. Despite its own staff's recommendation that the appeals should be denied, the Board of Supervisors voted to grant the appeals, finding that the NCER Project would result in peculiar environmental effects that would not be mitigated by uniform policies and procedures.

Hilltop Group filed a petition for writ of mandate in the San Diego Superior Court, and the court entered judgment in favor of the Board of Supervisors. Hilltop Group appeals the judgment and argues the Board of Supervisors did not proceed in a manner required by law and that their findings are not supported by substantial evidence. Specifically, Hilltop Group contends the NCER Project will not result in any significant and peculiar environmental effects that were not already evaluated by the program EIR for the GPU. The County argues that the Guidelines section 15183 exemption is not applicable to the NCER Project because the record supports a finding that the project will result in significant environmental impacts.

As we shall discuss, we conclude Guidelines section 15183 is applicable to the NCER Project because the project is consistent with the GPU and its related zoning designation for which a program EIR was certified. Thus, environmental review of the project shall be limited to those effects enumerated in Guidelines section 15183, subdivision (b)(1) through (4). The Board of Supervisors did not appropriately limit environmental review to only those project-specific peculiar impacts when they directed the

preparation of an EIR.  Moreover, we conclude the record does not support the Board of Supervisors' findings that the NCER Project's "peculiar" effects will not be substantially mitigated by previously adopted uniform policies and procedures.

**FACTUAL AND PROCEDURAL BACKGROUND**

### I.   2011 GPU and Program Environmental Impact Report

Land use in the County of San Diego is governed by a comprehensive general plan.  (Gov. Code, § 65300 et seq. ["the legislative body of each county . . . shall adopt a comprehensive, long-term general plan for the physical development of the county"].)  The County updated its general plan in 2011, adopting the GPU to serve as "a blueprint for future land development in the unincorporated County that meets community desires and balances the environmental protection goals with the need for housing, agriculture, infrastructure, and economic vitality."  To balance its goals and guide future development, the GPU established land use categories and a corresponding land use map.  The land use designations included, among others, residential, commercial, and industrial.

When the County adopted the GPU, the Board of Supervisors certified a program environmental impact report (PEIR) to address the GPU's potential environmental impacts.  The "series of actions analyzed in th[e] [PEIR] include[d] potential future development" resulting from the build-out and implementation of the GPU.  The PEIR explained that it was intended to cover "subsequent projects, tiering, and/or streamlining future documentation to the maximum extent allowed by State law."  Therefore, subsequent projects and activities within the scope of the PEIR, found by the County to have "no new effects" or require "no new mitigation measures" would not require "further environmental documentation."

4

However, the PEIR cautioned, "[w]hile the [PEIR] intends to identify potential impacts that would result from [the GPU] implementation, the level of analysis is not detailed to the level of site specificity, nor is it intended to be accurate to this level of specificity." Therefore, "[i]n most cases, future project-specific impact analyses would be required to determine whether a specific development project would or would not result in a potentially significant impact on the environment, such as impacts to biological resources, traffic, or air quality."

The PEIR determined that development from the GPU's land use designations may cause significant environmental impacts that would require mitigation measures. It included an analysis of feasible mitigation measures intended to reduce or avoid the environmental impacts created by the GPU and its related development. Even with the implementation of mitigation measures, the PEIR found significant and unavoidable impacts in numerous environmental areas, including, inter alia, aesthetics, air quality, noise, and traffic.

## II.  NCER Project Description and Application

In 2012, Hilltop Group submitted a project proposal to the County for the development of the NCER Project. Hilltop Group described the NCER Project as a recycling facility that would process and recycle trees, logs, wood, construction debris, asphalt, and other inert material from construction projects. The project was projected to process 20 tons of material per day and export 48 tons of repurposed material per day.

The NCER Project site was designated by the GPU as "High Impact Industrial" with a zoning classification of "General Impact Industrial." Recycling facilities such as the NCER Project are permitted on land zoned as

"General Impact Industrial." Thus, Hilltop Group's proposed use of the land was consistent with the County's land use designation in the GPU.

The NCER Project plan included an open space easement intended to protect 44 acres of natural habitat, and the project was projected to maintain visual separation from local landmarks. The project site is located directly west of Interstate 15, in a valley with steep slopes, and adjacent to parcels of land zoned as "semi-rural residential." The following map depicts the location of the project site relative to nearby residential communities.



### III. NCER Project Environmental Studies

Following the submission of their project proposal, Hilltop Group asked the County to proceed through the use of a mitigated negative declaration in

6

March 2014.  A site plan meeting for the NCER Project was conducted in April 2014 and was attended by representatives of Hilltop Group and County staff.  The meeting notes reflect that Hilltop Group asked County staff to rely on the PEIR to analyze the project, but the staff responded that "the GPU's EIR is a programmatic EIR and a project specific EIR is more detailed."

Thereafter, in September 2014, the County conducted an initial CEQA study of the NCER Project.  The study included a comprehensive description of the project and acknowledged that the NCER Project was consistent with the GPU and its related zoning designation.  The study also included a checklist of categories that the County analyzed to determine the project's potential environmental effects.  The checklist found potentially significant environmental impacts in the areas of aesthetics, air quality, biological resources, greenhouse gas (GHG) emissions, hydrology and water quality, hazards and hazardous materials, and noise.  The study concluded that further analyses were required to determine the extent of the environmental impacts.

Based on its findings in the initial study, the County issued a notice of preparation of an EIR and denied Hilltop Group's request to proceed by a mitigated negative declaration.  Neither the initial study, nor the notice of preparation of an EIR, indicate whether the NCER Project was evaluated for an exemption under Guidelines section 15183.  In a letter to Hilltop Group, a planning manager with the County indicated that an EIR was required, in part, because of the neighboring property owners' concerns regarding potential environmental impacts, including the effect of the NCER Project on community character.

In 2015, Hilltop Group submitted their initial draft EIR to the County. The draft EIR included more than a dozen studies, assessments, and plans,

7

and concluded that mitigation measures would reduce the NCER Project's potential environmental impacts to below significant levels. The County reviewed the draft EIR and determined that revisions were required because it did not adequately comply with various aspects of CEQA.

Hilltop Group then asked the County to process the NCER Project as a CEQA exemption under Guidelines section 15183. Hilltop Group asserted, "numerous technical studies show that the [NCER Project] will have no specific environmental effect[s] beyond those already assessed in the [PEIR], which the County certified in August 2011." According to Hilltop Group, the County failed to identify any significant project impacts that were not covered by the PEIR or incapable of being mitigated by the imposition of uniformly applied policies and standards.

The County initially disagreed that the project was eligible for the exemption, finding there were "issues peculiar to the [NCER] Project or the [NCER] Project site which currently prevent the [NCER] Project from using Guidelines section 15183." Specifically, the County expressed concern that the NCER Project would have potentially significant impacts on aesthetics, and that the visual simulations within the draft EIR did not sufficiently analyze all of the project's component parts and structures, or analyze views from specific trails. The County also identified deficiencies in the analyses of the project's effects on air quality, greenhouse gas emissions, biology, cultural resources, hazards, land use, noise, and water usage, all of which qualified as peculiar impacts under Guidelines section 15183. Hilltop Group was advised that if they revised "all technical studies to address the issues identified . . . to the satisfaction of County staff," the County would analyze their request to process the NCER Project under Guidelines section 15183.

8

Hilltop Group complied with the County's request and submitted additional technical environmental studies. Upon submitting the studies, they informed the County that the NCER Project would not result in any "peculiar effects and would not require regulation beyond the standard ordinances and regulatory requirements already in place by the state, and local agencies." They further argued that any potential environmental impacts would be adequately addressed through standard mitigation measures. In other words, according to Hilltop Group, the NCER Project would not result in environmental impacts more significant than those already identified and addressed in the PEIR and related regulatory ordinances.

## IV. Guidelines Section 15183 Checklist

County staff made Hilltop Group's environmental studies available for public review and invited public comment. In response, "over 500 people commented expressing their concern and opposition to the [NCER] Project." Nonetheless, based on the revised technical studies, County staff concluded that the NCER Project qualified for the Guidelines section 15183 exemption because the project was consistent with the development permitted by the GPU and analyzed in the PEIR.

Accordingly, the County prepared a Guidelines section 15183 checklist summarizing their findings that the NCER Project qualified for "an exemption from additional environmental review." Their conclusion was based on findings that: (1) the NCER Project was consistent with the zoning designations within the GPU; (2) there were no project-specific effects peculiar to the project or its site which the PEIR failed to analyze as significant effects; (3) there were no potentially significant off-site and/or cumulative impacts which the PEIR failed to evaluate; (4) there was no

9

substantial new information that the NCER Project would result in more severe environmental impacts than those anticipated by the PEIR; and (5) the NCER Project would undertake feasible mitigation measures specified in the PEIR.  Based on these findings, the County recommended that the Zoning Administrator issue a CEQA exemption pursuant to Guidelines section 15183.

## V.   Zoning Administrator Hearing

The County's Zoning Administrator conducted a public hearing in June 2020, to determine whether to issue the Guidelines section 15183 exemption. Prior to the hearing, County staff prepared a report summarizing the findings of their Guidelines section 15183 exemption checklist.  The report explained that although the County initially anticipated the preparation of an EIR, "after [a] review of the technical studies, it was determined [that] the [NCER] Project could qualify for a streamlined environmental review pursuant to CEQA Guidelines § 15183, because the Project is consistent with the General Plan and zoning."  The report concluded "[t]he technical studies showed that the [NCER] Project would not result in any significant impacts not previously addressed in the [PEIR]."

Staff presented a summary of their findings at the hearing and recommended that the Zoning Administrator grant the Guidelines section 15183 exemption.  Their recommendation was conditioned on the enclosure of the NCER Project's processing operations and a requirement that operations would take place between the hours of 7 a.m. and 7 p.m.

Hilltop Group also provided a presentation at the hearing in which they maintained that the NCER Project was consistent with the GPU, and that the project's facility was "fairly modest" relative to the size of the project site. They pointed out that although the project site is 140 acres, only 18 acres of

10

the site would be used for the recycling facility.  Hilltop Group noted that all of the environmental studies concluded that the NCER Project would not result in any peculiar environmental impacts.  Accordingly, they opined there was simply "nothing left to study."

Several community groups and homeowners associations expressed their opposition to the NCER Project at the hearing.  A representative of the Twin Oaks Valley Community Sponsor Group informed the Zoning Administrator that the group had been opposed to the designation of the project site as "high impact industrial" since the County's adoption of the GPU.  A representative of the Montreux Homeowners Association also expressed opposition to the NCER Project, noting that their community was less than a mile away from the NCER Project and overlooked the project site.  Individual members of the public commented at the hearing to oppose the Guidelines section 15183 exemption and the NCER Project as a whole.

The Zoning Administrator considered the County's findings and reports, as well as the public testimony, and approved the Guidelines section 15183 exemption request.  In issuing its decision, the Zoning Administrator found that the NCER Project was consistent with the GPU, would not result in any peculiar environmental impacts, and that feasible mitigation measures identified in the PEIR would be undertaken.

## VI.  NCER Project Plan Approval

Following the Zoning Administrator's approval of the Guidelines section 15183 exemption, PDS approved the NCER Project's site plan.  PDS included 65 conditions of approval in its decision to ensure that the NCER Project's environmental impacts remained less than significant.  One of the conditions of approval required that the project's processing operations take place in an enclosed building.

11

## VII. Appeals to the Planning Commission

Four groups—the Montreux Homeowners Association, the Twin Oaks Valley Community Sponsor Group, the Hidden Meadows Community Sponsor Group, and the City of Escondido—filed appeals with the Planning Commission following the NCER Project's site plan approval and the Guidelines section 15183 exemption request approval. County staff prepared a report responding to each of the 34 issues raised in the appeals. The report also summarized the County's review of the NCER Project and concluded that the project qualified for a CEQA exemption because its impacts would be less than significant in the areas of aesthetics, air quality, GHG emissions, noise, and traffic.

The Planning Commission conducted a public hearing during which it heard testimony from members of the public. Following public commentary, the Planning Commission voted unanimously to deny the appeals. In denying the appeals, the Planning Commission upheld the Guidelines section 15183 exemption and site plan approval on the condition that the NCER Project would not start onsite operations before 7:00 a.m.

## VIII. Appeals to the Board of Supervisors

Several community groups and homeowners associations, and the City of Escondido, appealed the Planning Commission's decision to the Board of Supervisors. The Board of Supervisors conducted a public hearing at which County staff with PDS, counsel for Hilltop Group, and members of the public presented their positions on the NCER Project's eligibility for the Guidelines section 15183 exemption.

### A. Summary of Appeals

The Twin Oaks Valley Community Sponsor Group argued in its appeal that the NCER Project would impact a sensitive biological habitat because

12

the project site was located within a pre-approved mitigation area (PAMA) and a wildlife movement corridor. Although the group acknowledged that the NCER Project's facility site was not considered PAMA, they argued that Hilltop Group previously illegally graded the site, which prevented such a designation. The Twin Oaks Valley Sponsor Group argued that the NCER Project's impacts would not be sufficiently mitigated by measures identified in the PEIR.

The City of Escondido argued in its appeal that the NCER Project would result in potentially significant impacts in the areas of aesthetics, GHG emissions, biological resources, noise, and traffic, all of which required additional environmental review. Further, it argued that substantial new information showed the environmental impacts of the NCER Project may be more significant than those anticipated by the PEIR.

The Montreux Homeowners Association asserted that their residential community is less than a mile from the NCER Project site and situated at the same elevation. Based on the NCER Project's unique location to nearby residential and low-intensity commercial uses, the association argued that the project is fundamentally incompatible with surrounding land use. They further contended that the technical reports relied on by the County were outdated, incomplete, and unreliable. Finally, because the County's initial study called for an EIR, and the County's notice of preparation of the EIR was never rescinded, the association asserted that a full EIR was required.

### B. County Staff's Written Response

In preparation for the public hearing, County staff with PDS provided a written analysis of the NCER Project in a letter to the Board of Supervisors. They recommended that the appeals should be denied and the Zoning Administrator's determination that the NCER Project qualified for a CEQA

exemption should be upheld. County staff based their conclusion that the appeals should be denied on their prior findings that the NCER Project did not present any significant or peculiar environmental impacts that were not previously analyzed in the PEIR. County staff acknowledged that they initially anticipated the preparation of an EIR due to the potential environmental impacts of the NCER Project, but explained that after review of the revised technical studies they were able to determine that the project qualified for an exemption under Guidelines section 15183. They informed the Board of Supervisors that, in reaching their conclusion, they considered the hundreds of public comments submitted in opposition to the project.

County staff's written response also addressed the 24 issues raised in the administrative appeals, including an argument that the studies prepared for the NCER Project were not permitted to rely on the PEIR until all mitigation measures identified in the PEIR were implemented. The staff asserted that although one of the mitigation measures in the PEIR, the County's Climate Action Plan (CAP), had been rescinded, the rescission did not invalidate the GPU or PEIR. Nor did Hilltop Group's GHG emissions analysis rely on the rescinded CAP.

### C. The Public Hearing

At the public hearing, the Board of Supervisors received 150 "e-comments," and heard presentations from the parties and commentary from 24 members of the public. The public commentary expressed opposition to the NCER Project and the CEQA exemption, and the commenters asked the Board of Supervisors to grant the appeals.

Hilltop Group again argued that the NCER Project qualified for a CEQA exemption under Guidelines section 15183 because it was consistent with the GPU and the County's zoning designation. They summarized the

14

extensive technical analyses supporting the County's determination that the project was exempt from further CEQA review. Hilltop Group pointed out that as a recycling center, the NCER Project would advance the County's waste diversion policy.

Following the conclusion of public comments, the Board of Supervisors expressed concern for the NCER Project's potential environmental impacts on air quality, noise, traffic, and GHG emissions. Although they did not identify what specific aspects of the project created the potential for significant environmental impacts, the Board of Supervisors nonetheless found that an "EIR is warranted." The Director of PDS suggested the following findings, which the Board of Supervisors included as part of the record:

"[T]he General Plan EIR did not analyze the specific project impacts in detail which will occur to the project's proximity to nearby residential uses from traffic, air quality, noise and [a]esthetic impacts resulting from the projects industrial operation.

"Implementation of uniformly applied development standards or policies from the General Plan EIR will not substantially mitigate these peculiar impacts from the project. Unlike other . . . industrial uses, this project is peculiarly cited in proximity to other non-industrial . . . and sensitive uses.

"The unique topographical and climatic conditions of this site need to be studied further to determine how nearby sensitive land uses will be affected from the significant dust, noise, and odor impacts from the particular project.

"The comprehensive environmental review of an EIR is required to inform the public fully of the project's specific impacts, ways to mitigate significant impacts and any alternatives to the project that will reduce or

15

avoid impacts.  In short, additional analysis is required to study the peculiar impact of the project which were not analyzed in the General Plan EIR for this specific site with its unique features, location, and surrounding uses."

Following these findings, the Board of Supervisors voted to grant the appeals.  In rendering their decision, they found that the NCER Project would result in project-specific peculiar impacts in the areas of "air quality, traffic, noise, and greenhouse gas emissions," which were not analyzed as significant in the PEIR.  They remanded the matter to the Zoning Administrator with direction to order the preparation of an EIR.

## IX.   Petition for Writ of Mandate

Hilltop Group filed a petition for writ of mandate in San Diego County Superior Court requesting the court to:  (1) set aside the Board of Supervisors' decision granting the administrative appeals and requiring the preparation of an EIR; and (2) direct the Board of Supervisors to affirm the Zoning Administrator's decision approving the Guidelines section 15183 exemption.  In its decision, the trial court noted that the County's own staff agreed with Hilltop Group that the NCER Project qualified for an exemption under Guidelines section 15183.  The court found that the Board of Supervisors' decision to grant the appeals and deny the exemption was "inconsistent with the existing record (including the staff's findings and recommendations)."  Nonetheless, the court denied the petition because it concluded there was a fair argument that the NCER Project may have "significant non-mitigable effects on the environment which are peculiar to the subject project, were not addressed as significant in the prior environmental impact report, and for which new information shows will be more significant than described in the prior environmental impact report." Hilltop Group timely appealed.

16

## DISCUSSION

### I.  CEQA Overview

"CEQA was enacted to advance four related purposes:  to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382.)  It requires that "all agencies of the state government which regulate activities . . . which are found to affect the quality of the environment, shall regulate such activities so that major consideration is given to preventing environmental damage . . . ." (§ 21000, subd. (g).)  CEQA and its related regulatory provisions provide for a multi-tiered review process when an agency is asked to approve an activity that may significantly affect the environment.  (*Lucas, supra*, 92 Cal.App.5th at p. 533.)

The initial tier of the CEQA review process requires "the agency to conduct a preliminary review to determine whether the proposed activity is subject to CEQA." (*Lucas, supra*, 92 Cal.App.5th at p. 534.)  At this stage, the agency determines whether the activity is a "project" within the meaning of CEQA—in other words whether the activity "may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment." (§ 21065; *Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1185 (*Union*).)  If the activity qualifies as a project, the agency must then determine whether the project is exempt from the CEQA review process under a statutory exemption

17

or a categorical exemption pursuant to the CEQA Guidelines. (*Union, supra*, at p. 1186.) If the project is exempt from further CEQA review, the agency may file a notice of exemption and need not proceed to the next steps of the review process. (*Lucas, supra*, at p. 534.)

One such exemption falls within Guidelines section 15183, subdivision (a), which requires no additional environmental review for projects " 'consistent with the development density established by existing zoning, community plan, or general plan policies for which an EIR was certified,' except as might be necessary to determine whether there are project-specific significant effects. Guidelines section 15183 was promulgated on the authority of . . . section 21083.3, which provides a public agency need examine only those environmental effects that are peculiar to the project and were not addressed or were insufficiently analyzed as significant effects in the prior EIR." (*Lucas, supra*, 92 Cal.App.5th at p. 534.)

If the agency concludes no exemption applies, the agency proceeds to the next tier of review. (*Union, supra*, 7 Cal.5th at p. 1186; *Lucas, supra*, 92 Cal.app.5th at pp. 534-535.) At this stage, the agency must "conduct an initial study [to] determine if the project may have a significant effect on the environment." (Guidelines, § 15063, subd. (a).) "If the initial study finds no substantial evidence that the project may have a significant environmental effect, the lead agency must prepare a negative declaration, and environmental review ends. [Citation.] If the initial study identifies potentially significant environmental effects but (1) those effects can be fully mitigated by changes in the project and (2) the project applicant agrees to incorporate those changes, the agency must prepare a *mitigated* negative declaration. This too ends CEQA review. [Citations.]" (*Union, supra*, at pp. 1186–1187.)

"Finally, if the initial study finds substantial evidence that the project may have a significant environmental impact that cannot be mitigated—and thus, the project does not qualify for a negative declaration—then the [last] tier of the CEQA process is reached." (*Lucas, supra*, 92 Cal.App.5th at p. 535.) At this stage, if substantial evidence in the record demonstrates a project may cause a significant effect on the environment, the agency shall "prepare and certify an EIR before approving or proceeding with the project." (*Union, supra,* 7 Cal.5th at p. 1187.) When an EIR is required at this stage, the Guidelines permit the Agency to either: (1) prepare an EIR; (2) use a previously ordered EIR which the agency determines would adequately address the project; or (3) "[d]etermine, pursuant to a program EIR, tiering, or another appropriate process, which of a project's effects were adequately examined by an earlier EIR or negative declaration." (§ 15063, subd. (b)(1)(A)-(C).)

## II. Standard of Review

"Appellate review under CEQA is de novo in the sense that we review the agency's actions as opposed to the trial court's decision." (*Lucas, supra*, 92 Cal.App.5th at p. 537.) "In considering a petition for a writ of mandate in a CEQA case, '[o]ur task on appeal is "the same as the trial court's." [Citation.] Thus, we conduct our review independent of the trial court's findings.' [Citation.]" (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 257.)

"The County's determinations as lead agency are reviewed for abuse of discretion. [Citation.] ' "[A]n agency may abuse its discretion under CEQA either by failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence." ' [Citation.]" (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th

19

467, 504 (*Golden Door*).) However, the applicable standard of review in CEQA cases is nuanced because, "within this abuse of discretion standard, review varies depending on the issue involved." (*Ibid.*)

Although the parties agree on the broad principles governing the standard of review in CEQA cases, they disagree on the applicable standard to determine the application of the Guidelines section 15183 exemption. Hilltop Group argues the substantial evidence standard applies to an evaluation of whether the exemption is applicable. According to the County, the fair argument standard applies.

The County cites to *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359 (*Gentry*), in support of their argument that the fair argument standard applies to review of a Guidelines section 15183 exemption determination because the "exemption requires a finding that a project will not have significant effect on the environment . . . ." However, the authority from *Gentry* the County relies upon is a footnote stating the court has previously "*suggested* that where a statutory exemption *does* depend on whether the project will have significant environmental effects (as does section 21083.3), the fair argument standard should govern review of an agency determination that the statutory exemption applies." (*Gentry, supra*, at p. 1406, fn. 24, first italics added, second italics in original.) But the *Gentry* court did not go so far as to expressly hold that the fair argument standard applies to review of a section 21083.3 exemption determination, and the court's footnote is, nonetheless, dicta. (*People v. Vang* (2011) 52 Cal.4th 1038, 1047, fn. 3 [Dictum is " '[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive). . . .' "]; *County Line*

20

*Holdings, LLC v. McClanahan* (2018) 22 Cal.App.5th 1067, 1074 ["footnote dicta" is the "lowest form of dicta"].)

Although the County acknowledges the recent decision in *Lucas, supra*, which holds that the substantial evidence standard applies to review of an agency's approval of a Guidelines section 15183 exemption, they argue that the fair argument test applies to review of a determination that the exemption is *not* applicable. We find no meaningful distinction between an agency decision approving a CEQA exemption, and a decision denying an exemption, that would warrant a differing standard of review. Guidelines section 15183 is simply a regulation that effectuates the statutory exemption in section 21083.3, and it therefore functions as a CEQA statutory exemption. (*Gentry, supra*, 36 Cal.App.4th at p. 1406 [section 21083.3 "provides a statutory exemption from CEQA . . ."].) " 'In determining whether an agency's findings concerning the use of a statutory exemption from CEQA may be upheld, we review the administrative record to see that substantial evidence supports each element of the exemption. [Citations.]' " (*Concerned Dublin Citizens v. City of Dublin* (2013) 214 Cal.App.4th 1301, 1311.)

Accordingly, we agree with our sister court in *Lucas, supra*, that the substantial evidence standard governs our review of a CEQA exemption, including that of Guidelines section 15183. Contrary to the County's argument, the eligibility of a project for the exemption in Guidelines section 15183 does not *solely* depend on whether a project will have significant environmental effects. Rather, it also "requires an agency to examine whether a project's environmental effects were analyzed as significant impacts in a prior EIR on a general plan or zoning action with which the project is consistent . . . ." (*Lucas, supra*, 92 Cal.App.5th at p. 538.) To analyze such an issue, the " '[f]air argument is not the proper standard of

review.  Substantial evidence is the proper standard where . . . an agency determines that a project consistent with a prior program EIR presents no significant, unstudied adverse effect.' [Citations.]" (*Ibid.*)  We note, however, that the substantial evidence standard requires us to resolve all conflicts in the evidence in support of the Board of Supervisors' action and indulge all reasonable inferences in favor of their findings.  (*Ibid.* ["All conflicts in the evidence are resolved in support of the agency's action and we indulge all reasonable inferences to support the agency's findings, if possible."].)

## III.  Analysis

The parties do not dispute that the NCER Project qualifies as a "project" for the purposes of CEQA review.  (See *Union, supra*, 7 Cal.5th at p. 1180 ["In general, a project is an activity that (1) is undertaken or funded by, or subject to the approval of a public agency and (2) may cause 'either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.'  [Citation]"].)  Nor do the parties dispute that the NCER Project is consistent with the GPU's zoning designation of the project site for "high impact industrial" use.  Indeed, the NCER Project site was zoned for industrial use in 2011 when the Board of Supervisors approved the GPU as part of its duties to adopt a plan to guide the physical development of the County.  (See Gov. Code, § 65300 et seq. ["the legislative body of each county" is responsible for adopting a comprehensive general plan for the county].)

The validity of the project site's designation for industrial use, or the wisdom of such a designation, is not before us.  Rather, the issue before this court is the extent to which the NCER Project is exempt from further environmental review under Guidelines section 15183 based on the project's consistency with the PEIR certified in conjunction with the GPU.  Although

we are mindful of the extent of public opposition to the project voiced at various public hearings, " ' "[t]he existence of public controversy over the environmental effects of a project shall not require preparation of an environmental impact report if there is no substantial evidence in light of the whole record before the lead agency that the project may have a significant effect on the environment." ' " (*McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 87 (*McCann*).)

As we shall discuss, we conclude the NCER Project is eligible for the streamlined environmental review process in Guidelines section 15183, which County staff elected to utilize, and therefore environmental review shall be limited to the circumstances enumerated in Guidelines section 15183, subdivision (b)(1) through (4).  The Board of Supervisors' decision requiring the comprehensive review of an EIR did not appropriately limit further environmental review in conformity with Guidelines section 15183, and therefore their decision did not proceed in a manner required by law. Moreover, we disagree with the County's argument that the initial study required the preparation of an EIR, even in the face of its later findings that the project qualified for a CEQA exemption.  We have not identified substantial evidence in the record to support the Board of Supervisors' findings that the NCER Project would result in "peculiar" impacts in the areas of aesthetics, noise, traffic, GHG emissions, and air quality, within the meaning of Guidelines section 15183, subdivisions (b)(1) and (f).

### A.  Guidelines Section 15183 Is Applicable to the NCER Project

Program EIRs, like the PEIR certified by the County in conjunction with the 2011 GPU, "are used for a series of related actions that can be characterized as one large project.  If a program EIR is sufficiently

23

comprehensive, the lead agency may dispense with further environmental review for later activities within the program that are adequately covered in the program EIR." (*Center for Sierra Nevada Conservation v. County of El Dorado* (2012) 202 Cal.App.4th 1156, 1171 (*Center for Sierra Nevada Conservation*); see also Guidelines, § 15168, subd. (c).) " '[A] program EIR may serve as the EIR for a subsequently proposed project to the extent it contemplates and adequately analyzes the potential environmental impacts of the project . . . .' [Citation.]" (*Center for Sierra Nevada Conservation*, at p. 1171.)

"However, '[a] program EIR does not always suffice for a later project. Sometimes a "tiered" EIR is required . . . .' [Citation.]" (*Center for Sierra Nevada Conservation, supra*, 202 Cal.App.4th at p. 1171.) " 'CEQA directs agencies to "tier" EIR's whenever feasible, in part to streamline regulatory procedures and eliminate repetitive discussions of the same issues in successive EIR's. [Citations.] Section 21068.5 defines "tiering" as the 'coverage of general matters and environmental effects in an [EIR] prepared for a policy, *plan, program* or ordinance followed by narrower or site-specific [EIR's] which incorporate by reference the discussion in any prior [EIR] and which concentrate on the environmental effects which (a) are capable of being mitigated, or (b) were not analyzed as significant effects on the environment in the prior [EIR].' (See Guidelines, § 15152, italics added.)" (*Id.* at pp. 1171–1172.)

Although section 21083.3 is not technically a tiering provision, but rather a CEQA "exemption," it functions as a streamlining procedure intended to "reduce[ ] the need to prepare repetitive environmental studies." (Guidelines, § 15183, subd. (a).) Thus, "[t]he results of section 21083.3 are much like those of tiering. If the new project has peculiar effects which were

24

not addressed in the prior EIR, it may be appropriate to use tiering to streamline review of those effects." (*Gentry, supra*, 36 Cal.App.4th at p. 1406; see also Guidelines, § 15152, subd. (h) [the process delineated in Guidelines section 15183 for projects consistent with a general plan is a "method[ ] [of] streamlin[ing] . . . environmental review."].)

Although agencies have discretion regarding which streamlining process to utilize (see Guidelines, § 15152, subd. (h)), they are required to limit their environmental review of a project when a program EIR has been certified for a general plan and a later project is consistent with the general plan. (See Guidelines, § 15152, subd. (d) ["Where an EIR has been prepared and certified for a program . . . any lead agency for a later project pursuant to or consistent with the program . . . should limit the EIR or negative declaration on the later project to effects which . . . [w]ere not examined as significant effects on the environment in the prior EIR . . ."].) Indeed, " '[t]o hold that a project-specific EIR must be prepared for all activities proposed after the certification of the program EIR, even where the subsequent activity is "within the scope of the project described in the program EIR" [citation], would be directly contrary to one of the essential purposes of program EIR's, i.e., to streamline environmental review of projects within the scope of a previously completed program EIR.' " (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 239.)

Consistent with an emphasis on streamlining future environmental review for projects within the scope of a program EIR, Guidelines section 15183 states that projects consistent with a general plan "*shall not* require additional environmental review, *except as might be necessary* to examine whether there are project-specific significant effects which are peculiar to the project or its site." (Guidelines, § 15183, subd. (a), italics added; see also

25

21083.3, subd. (b) [environmental review of a project consistent with a general plan for which an EIR was certified shall be limited to those effects on the environment which are peculiar to the parcel or project and were not addressed as significant effects in the prior EIR].) Thus, when an agency utilizes the streamlining process in Guidelines section 15183, the agency shall limit its examination of significant environmental effects which it determines: "(1) Are peculiar to the project or the parcel on which the project would be located, (2) Were not analyzed as significant effects in a prior EIR on the zoning action, general plan or community plan with which the project is consistent, (3) Are potentially significant off-site impacts and cumulative impacts which were not discussed in the prior EIR prepared for the general plan, community plan or zoning action, or (4) Are previously identified significant effects which, as a result of substantial new information which was not known at the time the EIR was certified, are determined to have a more severe adverse impact than discussed in the prior EIR." (Guidelines, § 15183, subd. (b)(1)-(4).)

The County interprets the limitations set forth in Guidelines section 15183, subdivision (b)(1) through (4), to be disqualifying circumstances, the presence of which render a project entirely ineligible for the exemption. They assert in their briefing on appeal that "the CEQA Guidelines section 15183 exemption applies only if there are no impacts that are peculiar to the project or its site." Hilltop Group similarly asserts that a project otherwise eligible for the Guidelines section 15183 exemption is "ineligible" if the agency determines the project has environmental effects peculiar to the project or project site.

We disagree with such a narrow interpretation of Guidelines section 15183 in which the exemption is entirely inapplicable if there are *any*

26

peculiar project-specific environmental impacts. (See Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2023) §13.50 (cited hereafter as Kostka & Zischke) [section 21083.3 "provides a *partial* exemption that limits the issues that must be discussed in a project-level EIR to significant impacts that were not covered in the prior planning or zoning EIR" (italics added)].) Guidelines section 15183 may require environmental review of aspects of a project not adequately covered by a program EIR, and exempt other aspects of the same project from further review because the environmental effects were previously and adequately addressed. (See Kostka & Zischke, § 10.35 ["Under various limits on the applicability of . . . § 21083.3, one or more of which may apply, some aspects of a later project may be exempt from CEQA while other aspects of the project may require some level of CEQA review."]; see also *Gentry, supra*, 36 Cal.App.4th at p. 1405 [examining whether a project was "partially exempt from CEQA under section 21083.3." (Capitalization & italics omitted.)].) The language of Guidelines section 15183 limits environmental review for qualifying projects to those effects that are peculiar and project-specific, or not addressed as significant in the prior environmental impact report, but does not state that such effects render the streamlined process wholly inapplicable.

Accordingly, because the NCER Project is consistent with the GPU for which the PEIR was certified, we conclude the streamlined process in Guidelines section 15183 is applicable to the project. The record demonstrates that County staff elected to utilize Guidelines section 15183 in their review of the NCER Project and they were within their discretion to do so. Therefore, the primary issue before this court is not whether the NCER Project is, broadly speaking, eligible for the streamlined review process

27

outlined in Guidelines section 15183. The express terms of Guidelines section 15183, subdivision (d), state that the regulation's streamlined review *is* applicable to the NCER Project because it is consistent with the GPU. Rather, the issue before this court is the extent to which the process is streamlined and what further review is required based on substantial evidence of the project's peculiar environmental impacts.

## B. The County's Initial Study Did Not Preclude Application of Guidelines Section 15183 to the NCER Project

The County argues the NCER Project is altogether ineligible for the Guidelines section 15183 exemption based on findings from the County's initial study that an EIR was required. The timeline of this case is certainly unusual because it was not until years after Hilltop Group submitted its initial draft EIR that the County indicated it would consider their request for a Guidelines section 15183 exemption upon the submission of additional technical studies. (See *Lucas, supra*, 92 Cal.App.5th at p. 534 [exemption eligibility determined in the first tier of CEQA review].) However, under the unique circumstances of this case, we conclude the initial study did not, as a matter of law, preclude the County's later determination that the NCER Project was eligible for the Guidelines section 15183 exemption following the submission of supplemental environmental studies.

Here, the County's initial study did not indicate that it made findings regarding the NCER Project's potential environmental impacts in the context of Guidelines section 15183. Rather, the study indicated that further analyses were required to determine the extent of the project's impacts. That the County did not have sufficient information to determine whether the NCER Project posed peculiar environmental impacts within the meaning of Guidelines section 15183 at the time of the initial study, or simply did not

undertake this analysis, does not necessarily preclude a later determination that the project qualified for a streamlined environmental review under applicable CEQA regulations. To unequivocally require the preparation of an EIR based on the initial study, even in the face of County staff's later findings that the project qualified for an exemption, would elevate form over substance. We decline to do so, particularly where County staff expressly represented to Hilltop Group that they would evaluate the NCER Project's eligibility for the CEQA exemption if Hilltop Group submitted additional environmental reports. (See *North Coast Rivers Alliance v. Westlands Water Dist.* (2014) 227 Cal.App.4th 832, 877 [court declined "to elevate form over substance or to interpret CEQA in a manner that would lead to . . . absurd or oppressive burdens"].)

Our conclusion does not conflict with the cases cited by the County in support of their argument that the initial study required the preparation of an EIR because these cases were not decided in the context of a Guidelines section 15183 exemption. (See *Union, supra*, 7 Cal.5th at p. 1187 [evaluating whether a medical marijuana ordinance was a "project" subject to CEQA review]; *Apartment Assn. of Greater Los Angeles v. City of Los Angeles* (2001) 90 Cal.App.4th 1162, 1167 [determining whether an initial study was required to evaluate whether the city's permanent code enforcement program qualified for a categorical CEQA exemption].) Further, the County's reliance on cases that required the preparation of an EIR based on an initial study misses the point of the Guidelines section 15183 exemption. The exemption permits streamlined environmental review not because a project does not have *any* potential environmental effects, or because those effects should not be analyzed—the exemption permits streamlined review because the project's effects were *already* sufficiently taken into account and addressed in a

29

programmatic EIR.  Upon findings in an initial study of a project's potential environmental effects, the Guidelines expressly authorize an agency to "[u]se a previously prepared EIR which the lead agency determines would adequately analyze the project at hand, or . . . [d]etermine, pursuant to a program EIR, tiering, or another appropriate process, which of a project's effects were adequately examined by an earlier EIR or negative declaration." (§ 15063, subd. (b)(1)(A)-(C).)

Accordingly, having concluded that Guidelines section 15183 is applicable to the NCER Project, and that the initial study did not preclude application of the exemption in this case, we turn to the scope of further environmental review permitted under the regulation.

### C. Insufficient Evidence Supports the Board of Supervisors' Findings That Uniform Policies and Procedures Will Not Substantially Mitigate the NCER Project's Potential Environmental Impacts

The Board of Supervisors' decision to require the preparation of an EIR was premised upon their finding that the NCER Project would result in "project-specific peculiar impacts that were not analyzed as significant impacts in the [PEIR] related to air quality, traffic, noise, and greenhouse gas emissions."  On appeal, the parties focus on Guidelines section 15183, subdivision (b)(1), which requires review of environmental impacts that are "peculiar" to a project.  Guidelines section 15183 does not define the term "peculiar" for the purposes of the exemption, except to state that an effect shall *not* be considered peculiar to a project if uniformly applied development policies or standards will substantially mitigate the effect.  (Guidelines, § 15183, subd. (f).)

In *Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273 (*Wal-Mart*), disapproved in part on other grounds as stated in *Hernandez v.*

30

*City of Hanford* (2007) 41 Cal.4th 279, 297, the court addressed the meaning of the term "peculiar to" within the context of Guidelines section 15183. The court applied the dictionary definition of the term to its analysis of whether a city ordinance was eligible for the exemption. (*Wal-Mart, supra*, at p. 294 ["Webster's Third New International Dictionary (1986) page 1663 defines 'peculiar' as '1a: belonging exclusively or esp. to a person or group . . . 3: tending to be a characteristic of one only: distinctive.' "].) The court considered an environmental impact to be "peculiar to" a project if the impact belonged exclusively or especially to the project or if it was characteristic of only the project. (*Ibid.*) The *Wal-Mart* court explained that its interpretation of the term "peculiar" was "consistent with the view that environmental review documents should be general when they cover general possibilities and specific when the specifics of a project are reasonably foreseeable." (*Id.* at p. 295.) Thus, the court concluded that although a program EIR may cover the general possibility that a location will be developed, when "a specific project is proposed for that location, its details will be presented to [the agency] for approval and [the agency] will be required to conduct another preliminary review to determine what additional environmental review, if any, is necessary for CEQA compliance." (*Id.* at p. 296.)

Unlike *Wal-Mart*, which analyzed whether a zoning ordinance would result in "peculiar" impacts, here we consider the application of the Guidelines section 15183 exemption to an individual industrial facility consistent with a zoning designation created by the GPU. The *Wal-Mart* court did not determine whether individual projects consistent with a zoning ordinance would require further environmental review under Guidelines section 15183. Nor does there appear to be published case law, in the context of Guidelines section 15183, that determines the extent to which individual

31

projects within a zoning ordinance require further environmental review when the zoning ordinance has already been adequately analyzed in a program EIR.

Nonetheless, we find *Wal-Mart's* interpretation of the term "peculiar" to be consistent with the stated goal of Guidelines section 15183—that projects consistent with a general plan for which a program EIR was certified shall not require additional review except as necessary to evaluate project-specific effects. (Guidelines, § 15183, subd. (a).) Under *Wal-Mart's* interpretation, the environmental effects of the NCER Project—both during its construction and operational phases—are certainly "peculiar" in the sense that they are unique to the project and the PEIR could not have possibly anticipated the project's specific impacts to the surrounding environment. Although the PEIR considered the general environmental impacts of the GPU's zoning designations, the PEIR's own terms explain that, "[o]n a programmatic level, the [PEIR] does not, and cannot, speculate on the individual environmental impacts of specific future development projects in the County." Its level of analysis is "not detailed to the level of site specificity, nor is it intended to be accurate to this level of specificity."

However, this does not end our analysis. Even if evidence in the record demonstrates the existence of project-specific environmental effects, an environmental impact "shall not be considered peculiar to the project or the parcel . . . if uniformly applied development policies or standards have been previously adopted by the city or county with a finding that the development policies or standards will substantially mitigate that environmental effect when applied to future projects, unless substantial new information shows that the policies or standards will not substantially mitigate the environmental effect." (Guidelines, § 15183, subd. (f).) Thus, contrary to the

County's assertions, the issue is not simply whether sufficient evidence in the record supports a finding that "the [NCER] Project may have significant environmental impacts." Rather, the issue is whether substantial evidence in the record supports the Board of Supervisors' findings that there are project-specific impacts that will not be substantially mitigated by previously adopted and uniformly applied policies and procedures. We address the parties' contentions regarding the substantial evidence, or lack thereof, that would support the Board of Supervisors' findings of "peculiar" impacts in the areas of aesthetics, noise, traffic, GHG emissions, and air quality, in turn, below.[3]

However, before we turn to our analysis, we note that in their decision, the Board of Supervisors failed to identify the specific nature of the NCER Project's "peculiar" impacts that required environmental review, except to point to broad environmental categories. Nor did the Board of Supervisors address, with specificity, the effect of uniform policies and procedures on these purported impacts. The PDS Director's statement at the appeals hearing that, "uniformly applied development standards or policies from [the PEIR] will not substantially mitigate these peculiar impacts," similarly lacked specificity.

The brevity of the Board of Supervisors' statement in support of their decision fails to "set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 515.) Although we must indulge all inferences in favor of the Board of Supervisors' decision, the

___

[3]     Throughout our discussion, we point to the County's citations to the record as the party defending the Board of Supervisors' decision. However, we are mindful that the County, as the respondent, does not bear the burden on appeal. (See *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 70.)

ambiguity of their findings in support of their ultimate decision makes meaningful judicial review challenging considering the record is over 48,000 pages. The nature of their decision requires us to "grope through the record to determine whether some combination of credible evidentiary items which supported some line of factual and legal conclusions supported the ultimate order or decision of the agency." (*Topanga Assn., supra*, at p. 516.) Considering the Board of Supervisors' findings are contradicted by its own staff's reports and the technical environmental studies evaluated by the County, the parties face a similarly daunting task of attempting to piece together substantial evidence in the voluminous record.

In their briefing on appeal, the County attempts to bridge this analytic gap by pointing to various public comments submitted during the course of the Guidelines section 15183 exemption determination, as well as to comments within the administrative appeals and staff communications. The County argues that these comments, which largely consist of lay opinion and personal observations, provide substantial evidence the NCER Project "may have significant environmental impacts."

Although substantial evidence may include " ' "[r]elevant personal observations of area residents on nontechnical subjects," ' " (*McCann, supra*, 70 Cal.App.5th at p. 87) it may not include "mere argument, speculation, and unsubstantiated opinion, even expert opinion . . . ." (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928; *Make UC A Good Neighbor v. Regents of University of California* (2023) 88 Cal.App.5th 656, 686 (*Make UC A Good Neighbor*) ["Substantial evidence may include personal observations of residents, expert opinions, and reasonable inferences based on facts, but not argument, speculation, or unsubstantiated opinions."].) The public commentary relied upon by the County largely consists of speculation of the

34

NCER Project's anticipated impacts on nearby residents. Although these comments discuss ways in which individuals and the broader community may be personally impacted by the NCER Project, they altogether fail to address whether the purported project-specific impacts will be substantially mitigated by uniform policies in the PEIR. These residents may very well be able to hear, see, or otherwise perceive some aspects of the NCER Project, but this is not the threshold for determining the applicability of Guidelines section 15183. Further, the County does not suggest that any of the commenters, whether individuals commenting at the public hearings, or representatives of nearby municipalities and homeowners associations, were experts or qualified to contribute expert testimony. (See *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572, 583 ["lay reading" of expert reports does not constitute substantial evidence to support a contrary conclusion reached in an expert report].) We are guided by these principles in our discussion below.

### 1. Aesthetics[4]

In their initial review of the NCER Project, the County expressed concern that the project could have potentially significant impacts on

---

[4] The parties dispute whether aesthetics was a basis for the Board of Supervisors' decision to deny the exemption and require an EIR. Although the Board of Supervisors did not include aesthetics as one of the impacts requiring the preparation of an EIR during their oral motion at the public hearing, the PDS Director read a statement into the record stating that the PEIR did not adequately analyze the project-specific impacts of the NCER Project in the area of aesthetics. Considering that the substantial evidence standard requires us to indulge all inferences in favor of the agency's findings and decision, we infer that the Board of Supervisors based its decision, in part, on the potential aesthetic impacts of the project, and we therefore consider whether there is sufficient evidence of these impacts to warrant further environmental review. (*Lucas, supra*, 92 Cal.App.5th at p. 538 ["All conflicts in the evidence are resolved in support of the agency's action and we

35

aesthetics, and that the visual simulations conducted by Hilltop Group to evaluate the project's aesthetic impacts were insufficient. Consequently, Hilltop Group submitted an additional visual impact analysis and a memorandum summarizing its results. The analysis concluded that visual impacts from the NCER Project would be less than significant, particularly once landscaping surrounding the processing facility reached full growth and concealed visible aspects of the project.

After reviewing the additional visual impact studies, the County found that the aesthetic impacts of the NCER Project would be less than significant and would not result in impacts not adequately evaluated or mitigated by the PEIR.[5] Specifically, through the use of their Guidelines section 15183 checklist, County staff determined the NCER Project would not pose significant effects on nearby scenic vistas because the processing facility would be out of view of lower lying areas and would be obstructed from further view by intervening topography and additional vegetation, fencing, and landscaping. The checklist further concluded that the project would not substantially damage scenic resources, degrade the existing visual character of the project site and its surrounding areas, or create a new source of substantial light. The checklist reached this conclusion, in part, because the grading that would occur due to the facility's construction would take place

_____

indulge all reasonable inferences to support the agency's findings, if possible."].)

[5]  The PEIR concluded that the GPU's development would result in potentially significant aesthetic impacts in the areas of scenic vistas and resources, but would be less than significant upon the use of mitigation. It further determined that there would be significant and unavoidable impacts in the areas of visual character or quality and light or glare. The PEIR included mitigation measures that must be undertaken by a project that will cause environmental impacts in the area of aesthetics.

on previously disturbed areas of land and because there was a significant elevation difference between the project site and surrounding areas. The checklist further noted that the NCER Project plan was consistent with the "I-15 Corridor Scenic Preservation Guidelines."

Notwithstanding these analyses and findings, the County argues on appeal that commentary submitted at various public hearings provides substantial evidence of the project's significant impacts in the area of aesthetics. The County provides a string cite to various comments in the record that mention the project's potential visual impacts, and they highlight a comment by the City of Escondido alleging that the visual impact reports failed to consider the project's impact on a development that has yet to be built.

As the County rightly notes, lay opinion from the community regarding a project's aesthetic impacts *may* provide substantial evidence that a project will have a significant impact on the environment. (See *McCann, supra*, 70 Cal.App.5th at p. 87 [" ' "Relevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence . . . . [Citations.]" ' "].) However, " ' "[s]ubstantial evidence is not argument, speculation, unsubstantiated opinion or narrative, evidence that is clearly inaccurate or erroneous, or evidence of social or economic impacts that do not contribute to, or are not caused by, physical impacts on the environment." [Citation.]' " In many cases, "individualized claims of aesthetic impact do *not* constitute substantial evidence." (*Id.* at p. 88.)

The public comments cited by the County are largely speculative and do not discuss whether the purported visual impacts of the project would be addressed by uniform policies within the PEIR. The commenters mostly remark on whether they will be able to personally observe the project site

37

from their residences and communities.  For example, one commenter observed, "[o]ur house has an unubstructed [*sic*] view looking directly toward the proposed plant location."  Another commenter stated, "[n]ever mind the fact that over 6,100 of the residents will now have to look at this industrial site rather than the hills we have enjoyed in the past."  Other commenters noted that Hilltop Group's visual impact analysis did not evaluate how a nearby future residential development may be affected.  These lay opinions and observations do not provide substantial evidence that any aesthetic impacts by the NCER Project will not be substantially mitigated by uniform policies in the PEIR.

Further, the comments that take issue with the technical studies conducted by Hilltop Group do not provide foundation for their opinions or sufficient expertise to support their conclusions.  For example, one commenter at the public hearing before the Board of Supervisors stated, "[t]he original [view impact analysis] accepted by the planning department employed outdated techniques and only addressed six views.  Take 360 degrees, divided by six, that's an average one view every 60 degrees.  I ask for analysis from nine neighborhoods using modern techniques and analysis." This lay opinion was "based on technical information that requires expertise [and] does not qualify as substantial evidence."  (*Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, 789 (*Newtown Preservation Society*).)

In sum, the public commentary discussed by the County does not provide substantial evidence of whether the NCER Project's visual impacts will be substantially mitigated by the uniform policies laid out in the PEIR. The public commenters largely express concern regarding their views of the NCER Project from various surrounding areas, including their own homes.

However, they do not address the relevant standard for the application of the exemption: whether any significant project-specific impacts will be mitigated by the measures included in the PEIR pursuant to Guidelines section 15183, subdivision (f). Accordingly, we conclude substantial evidence in the record does not support the Board of Supervisors' finding that the NCER Project will result in peculiar aesthetic impacts.

## 2. Noise[6]

The GPU requires the County to utilize "Noise Compatibility Guidelines" to determine the combability of land uses when evaluating proposed development projects. The County's initial study of the NCER Project found that it could potentially result in the generation of noise in excess of noise standards established in the GPU and a local noise ordinance. Accordingly, the initial study determined a noise analysis report was necessary to evaluate noise generating sources during the NCER Project's construction and its operational phases, in comparison with then-existing noise levels on the project site and the permissible noise levels in the GPU.

Hilltop Group conducted a noise analysis and reported their findings in their initial draft EIR. The analysis concluded that noise from the operation of the facility would comply with the County's noise ordinance and be less than significant. It also concluded that noise from rock crushing during the project's operational phase would be less than significant due to intervening

---

[6] The Legislature has declared that it is the state's policy to " '[t]ake all action necessary to provide the people of this state with . . . freedom from excessive noise.' (CEQA, § 21001, subd. (b).)" (*Make UC A Good Neighbor, supra*, 88 Cal.App.5th at p. 685.) For the purposes of a CEQA analysis, noise is included as part of the " '[e]nvironment.' " (§§ 21060.5, 21068.) Accordingly, "the noise caused by a project can result in a significant effect on the environment." (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 883 (*King & Gardiner Farms, LLC*).)

topography. However, the draft EIR concluded that the impacts from blasting during the construction of the facility would require mitigation measures to reduce the impact to less than significant levels. The mitigation measures included the creation of a blasting plan which limited the duration of blasting, notification to potentially impacted residential communities, and the incorporation of noise reducing measures required by the County's noise ordinance.

Thereafter, in its Guidelines section 15183 exemption checklist, the County concluded the NCER Project would not result in any significant noise-related impacts that were not adequately addressed by the mitigation measures within the PEIR. Their conclusion was based on Hilltop Group's noise analysis report prepared in 2013, and a supplement noise report prepared in 2019. County staff concluded that the facility's operational noise would comply with the County's noise standards due to the distance of the operating equipment from surrounding residential property lines, as well as the intervening topography. Although the exemption checklist acknowledged that noise from the NCER Project's construction would reach relatively high levels, it was not projected to exceed the allowable "75 dBA"[7] during the hours of operation. The checklist also considered the impact of noise from additional traffic and concluded the project would not result in a noise impact that would exceed the limits of the GPU. Ultimately, the exemption checklist determined the NCER Project would comply with the County's noise

---

[7] "A decibel (dB) is a unit that describes the amplitude of sound and is expressed on a logarithmic scale. A common metric is the overall A-weighted sound level measurement (dBA), which measures sound in a fashion similar to the way a person perceives or hears sound." (*King & Gardiner Farms, LLC, supra*, 45 Cal.App.5th at p. 885, fn. 36.)

ordinance in both its operational and construction phase, as required by the PEIR.

Notably, after the checklist was completed, a condition of the NCER Project's approval was that its processing facility must be enclosed. Based on this additional noise reduction, County staff again concluded that the project's noise levels would comply with uniform noise standards in the County's noise ordinance and would be less than significant.

County staff reported their noise-related findings to the Board of Supervisors prior to the public hearing. Their report determined that noise generated from the NCER Project would not result in significant impacts to any surrounding sensitive land uses, during either construction or the project's operational phase, particularly due to the enclosure of the processing facility. According to the County's report, the project's noise levels would comply with "applicable uniform noise standards in the Noise Ordinance at all the adjacent residentially zoned properties, substantially mitigating the effects of the Project."

In their briefing on appeal, the County argues in a single, four-sentence paragraph, that public commentary submitted at various hearings constitutes substantial evidence of "significant noise impacts." Specifically, the County contends that the public commentary provided evidence that prevailing winds carry noise much farther and louder than accounted for in the environmental studies and will potentially impact a pending residential community. The County also argues that the comments pointed out flaws in the noise-related technical studies.

The comments cited by the County do not discuss whether the NCER Project's potential noise impacts will be mitigated by uniform policies in the PEIR or local noise ordinances. Rather, the comments largely provide

personal anecdotes of residents describing their experience with noise in the area.  For example, at the hearing before the Zoning Administrator, commenters noted they were able to hear roosters crowing in a nearby valley and motorcycles and trucks driving from Twin Oaks Valley.  Based on these observations, one commenter opined that the industrial noise from the NCER Project would be a "major problem."  Another commenter felt that the project would force them "to listen to loud crushing machines all hours of the day."

At the 2021 Planning Commission hearing, commenters opined that the marine layer and wind would amplify noise from the project at particular times of the day.  Similarly, at the appeals hearing before the Board of Supervisors, the chairman of the Hidden Meadows Community Sponsor Group commented that the "residential uses are down wind from the project which means that they will have a potential of being impacted by noise, odors, and dust . . . ."  The Vice President for the Montreux Homeowners Association observed that prevailing winds blow through a neighboring valley near her home and allow her to hear bells and children playing from a nearby school.  Based on this observation, she opined that noise from the NCER Project's processing facility would be "loud" from her residence.  In an email sent in opposition to the project, one resident commented that they routinely hear gunshots from the project site and expressed concern that noise from the NCER Project would travel at similar levels.

Other community members commented that the noise analysis did not take into account variation in noise levels based on weather conditions.  The Montreux Homeowners Association argued in their appeal to the Board of Supervisors that Hilltop Group's noise consultant report applied the wrong standard and that foreseeable noise levels were not accounted for in the

PEIR. Similarly, another commenter opined that Hilltop Group's noise analysis relied on a dated, "unsigned and uncertified" analysis.

These comments do not address, much less provide substantial evidence, of whether uniform policies and procedures will substantially mitigate noise generated by the NCER Project. Rather, the comments speculate as to the amount of noise the project may produce, and ways in which the surrounding community may be able to perceive the noise. The lay opinions and observations calling into question the bases and results of the noise-related technical studies do not establish their expertise to provide such evidence, nor do they provide sufficient evidence of the alleged flaws in the technical studies. (See *Newtown Preservation Society, supra*, 65 Cal.App.5th at pp. 790-791 [substantial evidence does not include lay opinion based on technical information that requires expertise, or lay observations unrelated to similar projects in the past].) Accordingly, we are unable to identify substantial evidence within the record that supports the Board of Supervisors' finding of noise-related impacts that would not be mitigated by uniform policies and procedures in the PEIR or other noise ordinances.

### 3. Traffic

Hilltop Group argues there is no substantial evidence in the record to support the Board of Supervisions' determination that the NCER Project would result in peculiar traffic-related impacts. Hilltop Group notes that County staff concluded the NCER Project would not result in significant impacts in this area based on the traffic analysis and data submitted within their technical studies. According to Hilltop Group, the administrative record contains no data that conflicts with the traffic analysis or would demonstrate significant and peculiar traffic-related impacts.

43

The County points to comments in the record questioning the validity of Hilltop Group's traffic analysis as substantial evidence to support the Board of Supervisors' findings. The comments opine that Hilltop Group's traffic study was not based on the maximum potential use of the facility and that Hilltop Group failed to submit a "Haul Route Plan" as part of their environmental review. The County further argues that the traffic analysis did not comply with current CEQA Guidelines because there was no analysis of the NCER Project's vehicle miles travelled (VMT).

Like the evidence relating to aesthetics and noise, the public commentary cited by the County does not address the relevant issue of whether uniform policies will mitigate the project's purported traffic effects. By contrast, the environmental studies submitted by Hilltop Group, the County's exemption checklist and reports, the Zoning Administrator's findings, and the Planning Commission's findings, all concluded that the NCER Project will not result in any significant traffic-related impacts. We point out this distinction not to reweigh the evidence, but to emphasize that the lay commenters discussing the validity of the technical traffic analyses do not provide sufficient foundation for their expertise to provide their testimony or to undermine the factual premises upon which the technical studies based their conclusions. (See *Newtow Preservation Society, supra,* 65 Cal.App.5th at pp. 790-791.) Accordingly, we cannot identify substantial evidence in the record to support a finding that the NCER Project's traffic-related impacts would not be mitigated by uniform policies and procedures.

Further, we find no merit to the County's argument that Hilltop Group's traffic analysis was flawed for failing to analyze the NCER Project's VMT. As Hilltop Group notes, the VMT analytical requirement in Guidelines section 15064.3 did not become effective until July 1, 2020—a date *after*

Hilltop Group conducted their traffic analysis and the Zoning Administrator approved the CEQA exemption. The express terms of Guidelines section 15064.3 state that its provisions shall apply prospectively. (Guidelines, § 15064.3, subd. (c); see also *IBC Business Owners for Sensible Development v. City of Irvine* (2023) 88 Cal.App.5th 100, 123-124 [concluding that an agency was not required to perform a VMT analysis because their service-based traffic study was already undertaken before the effective date of Guidelines section 15064.3].)

### 4. Air Quality and GHG Emissions

As part of the initial environmental analysis requested by the County, Hilltop Group submitted an Air Quality and Greenhouse Gas Emissions Assessment to County specialists. County staff reviewed the assessment and determined that the NCER Project's GHG emissions and pollutants would be under the threshold established by the California Air Pollution Control Officers Association (CAPCOA). Hilltop Group notes that the County utilizes this screening threshold to determine GHG emission significance for the purposes of CEQA review. Based on this threshold, County staff concluded that the project's GHG emissions and air quality impacts would be less than significant. By contrast, the administrative record does not reveal any expert evidence concluding that the NCER Project's GHG emissions and air quality impacts would be significant and peculiar within the meaning of Guidelines section 15183, subdivisions (b)(1) and (f).

However, the County argues that Hilltop Group was not permitted to rely on the PEIR in their analysis of the NCER Project's GHG emissions because the PEIR's mitigation measures in this area depended on the County's 2018 Climate Action Plan (CAP). As the County notes, the CAP was set aside by this court in *Golden Door, supra*, 50 Cal.App.5th 467. The

45

County also takes issue with the screening threshold used in Hilltop Group's technical studies and points to public commentary in the record that questions the validity of the analytical methods used in the studies.

Hilltop Group acknowledges that the CAP was previously set aside but argues that the NCER Project's emissions were appropriately measured against a screening threshold established by the CAPCOA. Because the project's GHG emissions were projected to be below this threshold, Hilltop Group contends the record does not demonstrate significant environmental effects. Further, Hilltop Group disagrees with the factual bases of public commentary calling into question their technical analyses of the project's GHG emissions and air quality, but regardless, they contend that these comments were submitted by lay persons without the requisite expertise to challenge the technical studies.

Hilltop Group's technical studies, and the County's own specialists who analyzed the studies, concluded the NCER Project would not result in significant impacts in the areas of GHG emissions and air quality. By contrast, public commenters, who did not lay foundation for their expertise in these areas, opined that the GHG emission studies were inadequate and that the specialists relied upon mitigation measures no longer in effect. We recognize that we may not reweigh the evidence on appeal to determine whether the Board of Supervisors could have reached a contrary outcome (*Gentry*, *supra*, 36 Cal.App.4th at pp. 1399-1400), but the parties have simply not pointed to substantial evidence in the record, by those qualified to provide such evidence, that the NCER Project poses peculiar impacts as defined by Guidelines section 15183, subdivisions (b)(1) and (f), in the areas of GHG emissions and air quality. As we have now repeatedly explained, lay opinions may not constitute substantial evidence in an area that requires expert

46

analysis, as is the case with an air quality analysis. (*Newtown Preservation Society, supra*, 65 Cal.App.5th at p. 789.) The Board of Supervisors' broad statement that uniform policies will not substantially mitigate the effects of the NCER Project in the areas of GHG emissions and air quality does not bridge the analytic gap between this finding and the scientific data and County reports that conclude the opposite. Nor does the County cite to authority suggesting that there are no uniform polices or procedures that would appropriately mitigate the NCER Project's projected GHG emissions after the rescission of the CAP in 2018. Thus, we cannot conclude, based on the record before us, that substantial evidence supports the Board of Supervisors' determination that previously adopted uniform policies and procedures will not adequately mitigate the NCER Project's environmental impacts in the areas of air quality and GHG emissions.

## IV. Conclusion

In summary, we conclude Guidelines section 15183 is applicable to the NCER Project because it is consistent with the GPU for which a program EIR was certified. The Board of Supervisors did not proceed in a manner required by law when they denied the exemption and failed to limit further environmental review to those effects enumerated in Guidelines section 15183, subdivision (b)(1) through (4). The Board of Supervisors' findings of peculiar environmental effects—effects that will not be mitigated by previously adopted uniform policies and procedures—in the areas of aesthetics, noise, traffic, air quality, and GHG emissions, is not supported by substantial evidence in the record. Accordingly, we conclude the Board of Supervisors' decision denying the CEQA exemption and requiring the preparation of an EIR constituted a prejudicial abuse of discretion.

47

We also find no merit to the County's argument that Hilltop Group cannot demonstrate prejudice because the NCER Project application was not denied, but merely subjected to further environmental review. The County cites to no authority that would support such an interpretation of the term "prejudice," and under their interpretation Hilltop Group could be subject to an indefinite review process without judicial recourse so long as the project application is not formally denied. For the purposes of CEQA compliance, a "prejudicial" abuse of discretion "is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (§ 21168.5.) Such a prejudicial abuse of discretion has been demonstrated here.

## DISPOSITION

The trial court's judgment is reversed. The trial court is directed to enter a new judgment granting the petition and issuing a peremptory writ of mandate directing the County to set aside its decision granting the administrative appeals and requiring the preparation of an EIR. Hilltop Group shall recover its costs on appeal.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

IRION, J.